KUSKIN, J.T.C.
Plaintiff Chiron Corporation, a Delaware corporation with its corporate headquarters in California, has appealed assessments of corporation business tax (“CBT”) for tax years 1992, 1993, and 1994 imposed by the defendant Director of the New Jersey, Division of Taxation (“Director”) under the New Jersey Corporation Business Tax Act, N.J.S.A. 54:10A-1 to -41. Specifically, the appeal challenges the Director’s computation of plaintiff’s sales fraction (also called the receipts fraction), pursuant to N.J.S.A. 54:10A-6, with respect to revenue plaintiff received from its joint business with Ortho Diagnostic Systems, Inc. (“ODS”) located in New Jersey.
The sales fraction, along with property and payroll fractions, is used to allocate[1] a portion of a corporation’s income to New *531 Jersey when the corporation maintains a regular place of business outside of this State. See Mayer & Schweitzer, Inc. v. Director, Div. of Taxation, 20 N.J.Tax 217, 223-25 (Tax 2002) (describing in detail the functioning and components of the apportionment formula set forth in N.J.S.A. 54:10A-6). The numerator of the sales fraction includes, among other items, the taxpayer’s receipts from sales of personal property shipped into New Jersey, receipts from services performed in New Jersey, and royalties from the use of patents and copyrights in New Jersey.
Plaintiff asserts that:
(a) the revenue it received from the joint business, as consideration for a license of certain patents and know-how and sale of certain biological products, should be excluded from the numerator of plaintiffs sales fraction because the joint business did not constitute a separate entity and, therefore, plaintiff, in effect, paid the revenue to itself;
(b) even if the joint business constituted a separate entity, the relationship between plaintiff and the entity qualified for the flow through method of calculating plaintiffs allocation factor, and thus its sales fraction, under guidelines issued by the Director; and
(c) royalty revenues received by plaintiff in connection with a sublicensing by the joint business to Abbott Laboratories (“Abbott”) of patents and know-how for one of plaintiffs products should be excluded from the numerator of the fraction because the patents and know-how were not used in New Jersey.
Both plaintiff and the Director have moved for summary judgment. For the reasons set forth below, I hold that:
(1) the joint business constituted a separate partnership entity domiciled in New Jersey;
(2) all revenue received by plaintiff in connection with its sales to the joint business should be included in the numerator of the sales fraction;
(3) for purposes of calculating plaintiffs allocation factor and included sales fraction, the flow through method does not apply; and
(4) plaintiffs share of royalty revenue from Abbott was derived from Illinois and is not includable in the numerator of the sales fraction.
Consequently, I grant defendant’s motion for summary judgment in part and grant plaintiffs motion in part.
*532 I.

Facts

The following factual background has either been stipulated by the parties or is not in dispute. Plaintiff is a Delaware corporation with its corporate headquarters in California. It is engaged primarily in the business of manufacturing antigens and antibodies usable for detecting the hepatitis C virus (“HCV”) and the human immunodeficiency virus (“HIV”) and manufacturing other biological agents usable to detect human diseases. Because plaintiff lacked adequate capabilities to manufacture, market, and sell test kits using its technology, on October 3, 1986, it entered into a license, research, and supply agreement (the “1986 Agreement”) with ODS, which had the experience and capabilities that plaintiff lacked in the development, testing, manufacturing, and marketing of diagnostic products. This agreement provides background to a second agreement dated August 17, 1989 (the “1989 Agreement”), which terminated and superseded the 1986 Agreement and was in effect during the years under appeal.
Under the 1986 Agreement, plaintiff agreed to conduct a research program for the development of antigens and antibodies to be used for diagnostic testing. Each party agreed to contribute certain funds to finance the research program, and ODS agreed to perform clinical and pre-clinical trials with respect to any antigens and antibodies developed by plaintiff. Plaintiff granted ODS an exclusive worldwide license to plaintiffs inventions, discoveries, trade secrets, information, experience, data, formulas, procedures, and results developed during the research program and any patents which plaintiff might obtain in connection with such research. ODS granted to plaintiff a worldwide non-exclusive royalty free license for inventions, discoveries, trade secrets, information, experience, data, formulas, procedures, and results and improvements thereon relating to ODS’s use of antigens and antibodies and development of test kits using the antigens and antibodies. Plaintiff further agreed to supply to ODS all of ODS’s requirements of antigens and antibodies. ODS agreed to purchase its requirements from plaintiff, and pay plaintiff for eighty *533 percent of ODS’s forecasted requirements even if it did not purchase that amount. The 1986 Agreement established a supervisory board consisting of three senior executives from each of plaintiff and ODS, the function of which included overseeing performance by the parties of their respective obligations under the Agreement, reviewing and analyzing research developments, encouraging and facilitating cooperation between the parties, and suggesting “new areas of research and development” for the antigens and antibodies provided by plaintiff and for test kits manufactured by ODS, “including possible acquisition of third-party technology.”
Prior to August 17, 1989, plaintiff and ODS became aware that Abbott, an Illinois corporation, was interested in receiving a license to use some of the same technology and know-how that plaintiff had licensed to ODS. In order to facilitate an agreement with Abbott, plaintiff and ODS entered into the 1989 Agreement which had an initial term of fifty years with automatic five-year renewals thereafter. This Agreement recites that its purpose is to “restructure and expand” the scope of the 1986 Agreement and provide for the sublicensing of certain rights to Abbott. Under the 1989 Agreement, plaintiff was primarily responsible for research and for manufacturing antigens and antibodies for use in detecting HCV and HIV, and ODS was primarily responsible for development, marketing, and sales of “Products,” defined as immunoassay, immunoassay kits, and immunoassay test configurations using the antigens and antibodies provided by plaintiff. As in the 1986 Agreement, plaintiff agreed to supply ODS’s requirements for antigens and antibodies, and ODS agreed to purchase its entire requirements from plaintiff. The minimum payment obligation imposed on ODS in the 1986 Agreement was eliminated from the 1989 Agreement, and the 1989 Agreement protected plaintiff only if ODS had quarterly requirements greater than 130% of its initially forecasted requirements. All deliveries of antigens and antibodies were expressly defined as being F.O.B. at plaintiffs plant in California, with title and risk of loss to pass to ODS upon acceptance of delivery at plaintiffs facility.
*534 Although the 1989 Agreement obligated plaintiff to use its “best efforts” to supply ODS with its requirements for antibodies and antigens, ODS had no express obligation to use the antigens and antibodies to manufacture Products or to sell or market any minimum quantity of Products. ODS had the right to reduce or cease entirely the commercial sale of any Products using plaintiff’s antigens and antibodies for detection of HCV. Plaintiff had the right to transform the agreement into a non-exclusive license with respect to all non-HCV products and all antigens and antibodies other than HCV antigens and antibodies if ODS failed to achieve and maintain minimum sales of $5,000,000 per year of non-HCV products.
The management structure for the joint business under the 1989 Agreement consisted of a supervisory board as under the 1986 Agreement. The board retained the responsibilities set forth in the 1986 Agreement, but the 1989 Agreement expanded the board’s power and authority to include consideration and approval of an annual strategic plan and an annual budget for the business. The board continued to consist of three senior executives from each of plaintiff and ODS. If the representatives of the two entities could not agree on a strategic plan or. budget, then the 1989 Agreement authorized ODS “in its sole discretion” to determine the strategic plan and the budget for the following year as well as the allocation of operating expenses to specific budget categories. ODS also had the sole discretion to assign responsibilities to the parties for the performance of specific functions contemplated by the strategic plan, except that plaintiff would be responsible for research and manufacturing antigens and antibodies. If, however, the sublicensing revenue from Abbott did not exceed specified amounts, then the strategic plan and budget for the next year would be determined by a neutral third party. The authority of the supervisory board was also limited by the 1989 agreement to the extent that the operating expenses allocated to plaintiff for research and development could not exceed 30% of the total expense budget and the expenses allocated to ODS could not exceed 70% of the total expense budget for the business enterprise. The 1989 Agreement provided that, “the parties shall in *535 good faith endeavor to spend up to the limits provided for [in an approved budget].”
Plaintiff granted to ODS “an exclusive worldwide license, without the right to sublicense” (with certain specific exceptions) of plaintiffs know-how and any of plaintiffs patents “to make, have made, use and sell Products within the Field of Use, and, to the degree necessary, any further license necessary to make the warranties made by Chiron and ODS in the Abbott Immuno Diagnostics Agreement true and complete in all respects.” The definition of “Products” in the 1989 Agreement was the same as in the 1986 Agreement, that is, immunoassays, immunoassay kits, or test configurations which contained antigens or antibodies provided by plaintiff. The definition of “Field of Use” was the use of any immunoassay “for the direct or indirect detection of hepatitis viruses or retroviruses in humans or human samples.”
In the 1989 Agreement ODS granted to plaintiff a worldwide “non-exclusive, royalty-free license, without the right to subli-cense” for the use of ODS’s know-how and patents to be used by plaintiff in its research, manufacturing and other obligations under the Agreement and under the agreement with Abbott. ODS was granted permission to sublicense to Abbott under the license ODS received from plaintiff.
Plaintiff and ODS shared equally in the profits generated by the joint business from the sale of blood testing kits, after reimbursement to them of their respective expenses as authorized in the budget, and they shared equally in royalty payments from Abbott. If the business suffered a loss, each party shared equally in the amount of the loss. The parties agreed to cooperate in obtaining an agreement by Abbott to pay plaintiff directly a portion of the royalty payments to be made by Abbott and to reimburse plaintiff directly for certain expenses. The Agreement also provided that, if it terminated, neither the sublicense granted to Abbott nor Abbott’s right to use the technology covered by the sublicense would terminate.
The 1989 Agreement did not provide for the preparation of separate financial books and records for the joint business, but *536 each party was obligated to provide the other with a written report at the end of each calendar quarter setting forth, in the case of plaintiff, its expenses for the quarter, and, in the case of ODS, its revenues received and expenses for the quarter.
The 1989 Agreement provided that the parties owned jointly any patent or know-how invented by them jointly and that each would attempt to obtain a license for the use of any competitive technology and the right to sublicense that competitive technology to Abbott. Advertising with respect to the subject matter of the Agreement had to contain the names of both plaintiff and ODS.
The 1989 Agreement was amended on December 22, 1989 so as to permit plaintiff and ODS to acquire tangible assets and intangibles from DuPont. Each party was granted the right to use the purchased assets to the extent necessary or appropriate to carry out the business contemplated by the Agreement. Under the agreement with DuPont, plaintiff and ODS together received “a paid-up exclusive license” to use certain DuPont patents, customer lists, product information, and research and development information. A second amendment to the 1989 Agreement, dated October 12,1993, eliminated ODS’s obligation to purchase its requirements of antigens and antibodies from plaintiff. Under the amendment, ODS had the right to elect to obtain those materials from plaintiff, and, to the extent ODS so elected, plaintiff was obligated to supply the materials.
Simultaneously with the entry into the 1989 Agreement, plaintiff and ODS entered into a License and Supply Agreement with Abbott (the “Abbott Agreement”). Under this document, ODS, as holder of a license from plaintiff, sublicensed to Abbott plaintiffs technology as to HCV and granted Abbott a worldwide, nonexclusive license to use the antigens and antibodies provided by plaintiff for research purposes and for purposes of making and selling immunoassays, immunoassay kits, and immunoassay test configurations for the detection of HCV. Plaintiff agreed to supply, and Abbott agreed to purchase from plaintiff, all of Abbott’s requirements for antigens and antibodies. The Abbott Agreement *537 further provided that, if the 1989 Agreement terminated, Abbott’s rights under its sublicense would not be terminated.
Abbott granted to plaintiff and ODS a worldwide, non-exclusive license to use Abbott’s know-how and technology and to make, use, and sell immunoassays and kits using that know-how and technology. Abbott agreed to pay ODS a specific price for each assay that could be performed using an immunoassay, immunoassay kit, or immunoassay test configuration manufactured by Abbott using the sublicensed technology. In addition, Abbott agreed to pay to ODS, 110% of plaintiffs manufacturing cost for antigens and antibodies supplied to Abbott, except that Abbott agreed to pay directly to plaintiff an amount based on $250 per milligram of antigens and antibodies delivered, plus 20% of plaintiffs manufacturing cost. All amounts paid directly to plaintiff were to be credited against the amounts otherwise payable to ODS. The 1989 Agreement provided that any amounts paid directly to plaintiff by Abbott under the Abbott Agreement could be offset against plaintiffs share of profits from the joint business.
In November 1993, plaintiff and ODS entered into an agreement with Pasteur Sanofi Diagnostics (“PSD”), a French company, granting it a “limited, non-exclusive license” under patents of plaintiff or ODS or as to which either of them had a license, for purposes of having PSD make, import, use and sell HCV immunoassay products. The “Background” section of the agreement describes the relationship between plaintiff and ODS as follows:
Pursuant to an Agreement dated August 17, 1989 between Ortho and Chiron (the “Ortho/Chiron Agreement”) Chiron and Ortho together are engaged in a long-term collaborative effort for the joint research, development and commercialization of certain immunoassays, including but not limited to assays of the type licensed under this Agreement. Chiron and Ortho are entering into this Agreement as part of such collaborative effort.
On September 19,1994, plaintiff and Merck & Co., Inc., entered into an agreement for which plaintiff licensed to Merck certain patentable and unpatentable inventions and technologies developed by plaintiff. Merck agreed to pay plaintiff royalties in specified amounts for the use of the license. Merck was a New Jersey corporation with its corporate offices in New Jersey, and, for purposes of determining the numerator of plaintiffs sales *538 fraction, the Director determined that the royalty payments from Merck should be included. The Director also determined that royalties paid to plaintiff by Ethicon, a New Jersey corporation with its offices in New Jersey, for licensing of plaintiffs technology were to be included in the numerator of plaintiffs sales fraction.
For each of the years under appeal, 1992, 1993 and 1994, the joint business filed a federal Partnership income tax return, using its own federal identification number. The return identified the Partnership as “ODSI/Chiron HIV and Hepatitis Business” with an address at 1001 U.S. Highway 202, Raritan, New Jersey (the address of ODS’s offices). The Schedules K-l issued to plaintiff and ODS pursuant to the Partnership return showed each as a 50% partner. The joint business did not file tax returns in New Jersey, either as a Partnership or otherwise. Plaintiff filed an individual New Jersey Corporation Business Tax return and a federal income tax return for each of the years under appeal. In both returns, plaintiff reported its income from the business with ODS as income from the “Ortho Joint Venture.”
II.

Partnership or Joint Venture

Under N.J.S.A. 54:10A-6, the sales fraction is defined in pertinent part as follows:
The sales fraction is the receipts of the taxpayer, computed on the cash or accrual basis according to the method of accounting used in the computation of its net income for federal tax purposes, arising during such period from ...
2) sales of tangible personal property located without the State at the time of the receipt of or appropriation to the orders where shipment is made to points within the State ...
5) ... royalties from the use of patents or copyrights, within the State,
6) all other business receipts ... earned within the State, divided by the total amount of the taxpayer’s receipts, similarly computed, arising during such period from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State____
Plaintiff does not dispute that its sales of antigens and antibodies to ODS are included under item (2) of the definition. Plaintiff contends, however, that its relationship with ODS was a joint *539 venture, and that, consequently, one-half of its sales of antibodies and antigens to the joint venture constituted sales to itself. Plaintiffs position is summarized in its brief as follows:
To the extent that such transfers [of antigens and antibodies] were considered transfers by Chiron to Ortho, Chiron treated the transfers as “sales” to Ortho and as a New Jersey receipt. Chiron included such receipt in both the numerator and the denominator of its receipt factor. To the extent that such transfers were considered as transfers by Chiron to itself, Chiron did not treat the transfers as “sales” and did not include such transfers in either the numerator or the denominator of its receipt fraction.
Plaintiff asserts that the following announcement published in State Tax News supports its position:
Inquiries have been received by the [New Jersey Division of Taxation] regarding factor representation of joint venture interests for Corporation Business Tax purposes. Since joint ventures are not separate legal entities for New Jersey tax purposes, the pro rata share of joint venture real and tangible personal property, receipts and wages both within and without New Jersey must be included in determining the corporate business allocation factor of the venturer. Similarly, the proportionate share of income and expense must be included in the co-venturer’s taxable net income. This reflects the Division’s historical position which is independent of any unitary/non-unitary analysis in a particular case. A copy of Federal Form 1065 [ (the Federal Partnership Tax Return) ] should be included when filing the Return.
[N.J. Div. of Taxation, 25 State Tax News, Spring 1996, at 4 (citation omitted).]
Plaintiff characterizes its relationship with ODS as a joint venture on the following bases:
(1) the enterprise had a single purpose, that is, to market the HCV and HIV technologies in the immunodiagnostic field of use;
(2) the relationship between plaintiff and ODS was relatively informal in that each was free to conduct its operations on behalf of the joint business independently and without scrutiny by the other party; and
(3) each party was free to pursue other business opportunities.
The Director contends that the joint business constitutes a partnership and not a joint venture, and argues that, whatever title is attached to the form of the business, it remains a separate entity for CBT purposes.
Under the Uniform Partnership Law as in effect in New Jersey during the years under appeal, “part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property.” N.J.S.A. 42:1-7(2), repealed by L. 2000, c. 161, § 59. The statute also provided, however, that a party’s receipt of a share of the profits *540 of a business “is prima facie evidence that he is a partner in the business.” N.J.S.A. 42:1-7(4), repealed by L. 2000, c. 161, § 59. Under the Revised Uniform Partnership Act, L. 2000, c. 161, which became effective in New Jersey in 2000, “the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership.” N.J.S.A. 42:1A-10(a). The revised statute also provides that a party receiving a share of business profits “is presumed to be a partner in the business,” unless the profits are received in payment of specific obligations of the entity. N.J.S.A. 42:1A-10(e)(3).
The definition of a partnership in Black’s Law Dictionary is “[a] voluntary association of two or more persons who jointly own and carry on a business for profit.” Black’s Law Dictionary 1152 (8th ed. 2004). The definition also includes a “particular partnership” which is defined as a partnership “in which the members unite to share the benefits of a single transaction or enterprise.” Id. at 1153. Black’s defines a joint venture as “[a] business undertaking by two or more persons engaged in a single defined project. The necessary elements are: (1) an express or implied agreement; (2) a common purpose that the group intends to carry out; (3) shared profits and losses; and (4) each member’s equal voice in controlling the project.” Id. at 856.
The Internal Revenue Code- draws no distinction between a partnership and a joint venture. In I.R.C. § 7701(a)(2), the term partnership is defined as including a “joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on____” Based on this definition, the filing of a partnership return by the joint business does not, in itself, constitute an admission by plaintiff that its relationship with ODS was a partnership, because, under the federal definition, a partnership return was appropriately filed even if plaintiff contended that the entity filing the return was a joint venture. The Director has adopted the definition of a partnership set forth in I.R.C. § 7701(a)(2). N.J.A.C. 18:7-7.6(f) (stating that “the term ‘partnership’ has the same meaning as is *541 set forth under I.R.C. § 7701(a)(2) and the regulations issued thereunder.”).
Generally the courts have drawn little distinction between partnerships and joint ventures under New Jersey law.
Under New Jersey law, joint ventures are virtually identical to partnerships, and the same rules apply to both relationships when determining the respective parties’ obligations. See, e.g., 68th St. Apts., Inc. v. Lauricella, 142 N.J.Super. 546, 559 n. 2, 362 A.2d 78 (Law Div.1976), aff'd, 150 N.J.Super. 47, 374 A.2d 1222 ([App.Div.] 1977) (holding the rules of law which apply to partners also apply to joint ventures); Kozlowski v. Kozlowski, 164 N.J.Super. 162, 171, 395 A.2d 913 (Ch.Div.1978), aff'd 80 N.J. 378, 403 A.2d 902 (1979) (noting the elements of a joint venture are virtually identical to those required for a partnership and the rules of law which apply to partners also apply to joint ventures); Silverstein v. Last, 156 N.J.Super. 145, 152, 383 A.2d 718 (App.Div.1978) (stating the classification of relationship as a joint venture or partnership is immaterial in terms of fiduciary obligations owed by one participant to another); A. Bromberg & L. Ribstein, 1 Bromberg and, Ribstein on Partnership § 2.06(a), at 2:42-43 (1988) (“Most courts have chosen to distinguish between isolated transactions and continuing enterprises by classifying the former as joint ventures and applying partnership law with little or no modification.”).
[Walter v. Holiday Inns, Inc., 784 F.Supp. 1159, 1167 n. 10 (D.N.J.1992) aff'd, 985 F.2d 1232 (3d Cir.1993).]
See also, Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pennsylvania, Inc., 49 F.Supp.2d 728, 736 (D.N.J. 1999) (defining the elements of a joint venture as virtually identical to those of a partnership). In Wittner v. Metzger, 72 N.J.Super. 438, 178 A.2d 671 (App.Div.1962), the court quoted the following from Cooperstein v. Shapiro, 122 N.J. Eq. 238, 241, 192 A. 826 (E. & A.1937):
A joint adventure is not dissimilar to a partnership the character of the relationship being more informal and usually limited to a single transaction although the conduct of the particular business may continue for a number of years.
[Wittner v. Metzger, supra, 72 N.J.Super. at 444, 178 A.2d 671.]
I conclude that the joint business between plaintiff and ODS constitutes a partnership for purposes of determining plaintiffs CBT liability and, in the remainder of this opinion, I will refer to the entity as the Partnership. The following elements of the relationship between plaintiff and ODS provide the basis for my conclusion:
*542 (1) the 1989 Agreement is not limited to a single enterprise. The document specifically recites that it is intended to “restructure and expand the scope” of the 1986 Agreement. Although the definition of the term “Product” under the 1989 Agreement relates to immunoassays, immunoassay kits, and immunoassay test configurations using or containing antigens or antibodies provided by plaintiff, the Agreement also provides (as did the 1986 Agreement) that the supervisory board has the responsibility to suggest “new avenues or areas of research and development for Antigens and Antibodies and/or Products, including possible acquisition of third-party technology, as they are identified.” The 1989 Agreement expressly contemplates that each party will pursue and acquire rights from third parties to use “competitive or complimentary technology and developments pertaining to the development or manufacture of Antigens, Antibodies or Products and related test configurations and related assay systems and technology related to instrument or other diagnostic read out systems;”
(2) under the 1989 Agreement, the joint business has its own annual budget and annual strategic plan;
(3) the supervisory board constitutes a separate management structure for the joint business;
(4) the 1989 Agreement expressly provides for a relationship with a third-party, Abbott, for the sublicensing of technology licensed by plaintiff to ODS, and plaintiff and ODS agree to sublicense to Abbott any competitive technology which may be acquired by either of them for use by the joint business;
(5) the 1989 Agreement provides that plaintiff and ODS jointly will own any patent or know-how invented by them jointly;
(6) the term of the 1989 Agreement is fifty years with automatic five year renewals;
(7) under the agreement with DuPont, plaintiff and ODS together were granted a single license to use certain technology and information; and
(8) both plaintiff and ODS, as part of their “long-term collaborative effort,” entered into the agreement described above with PSD.
Because plaintiffs joint business with ODS resulted in the formation of a separate partnership entity for purposes of calculating CBT, plaintiffs sales to ODS of antigens and antibodies for use on behalf of the business constituted sales to the Partnership. Plaintiff did not sell one-half of the antigens and antibodies to itself, as it contends, and, did not pay its share of Partnership revenue to itself. Therefore, the numerator of its sales fraction must be calculated on the basis of the revenues derived from all sales of antigens and antibodies to ODS pursuant to the 1989 Agreement.
*543 III.

The Flow Through Method

Having determined that the joint business constitutes a partnership, and thus a separate entity for CBT purposes, I next must address plaintiffs argument that it was so integrated with the entity that plaintiffs income allocation factor under N.J.S.A. 54:10-6, and therefore the sales fraction component of the allocation factor, should be calculated using the flow through method (denominated “flow through accounting apportionment” in N.J.A.C. 18:7-7.6(g)).[2]
If the flow through method is not applicable, the separate entity method (denominated “separate accounting apportionment” in N.J.A.C. 18:7-7.6(g)) would be used to calculate the allocation factor, and thus the sales fraction, for a corporation, such as plaintiff, owning a partnership interest. N.J.A.C. 18:7 — 7.6(g)(1) and Example I. See also New Jersey Division of Taxation, Technical Bulletin-3, issued June 21, 1991 and expiring June 30, 1992 (discussed below). Under the separate entity method, the corporation’s allocation factor, and thus its sales fraction, is calculated by determining a separate allocation factor (using a separate sales fraction) for the partnership and a separate allocation factor (using a separate sales fraction) for the corporation. The partnership’s sales fraction has, as its numerator, the partnership’s New Jersey receipts (as defined in N.J.S.A. 54:10A-6(B)) and, as its denominator, the partnership’s total receipts. The corporation’s sales fraction has, as its numerator, the corporation’s New Jersey receipts and, as its denominator, the corporation’s total receipts, with receipts attributable to the partnership excluded from both the numerator and denominator. Separate property and payroll fractions for the partnership and for the corporation also are calculated using a similar methodology. The allocation factor (representing, for the years under appeal, an average of the sales, property, *544 and payroll fractions[3]) for the partnership then is multiplied times the corporation’s distributive share of partnership income, and the allocation factor for the corporation is multiplied times the corporation’s income exclusive of its distributive share of partnership income. The total of the two amounts so determined constitutes entire net income (defined in N.J.S.A. 54:10A-4) used to calculate CBT liability under N.J.S.A. 54:10A-5 (setting forth how the tax is to be computed).
Under the flow through method, a single allocation factor is calculated for the partnership and the corporation. The sales, property, and payroll fractions comprising the allocation factor have, as their respective numerators, the corporation’s New Jersey receipts, New Jersey property, and New Jersey payroll (including the corporation’s share of the partnership’s New Jersey receipts, property, and payroll, respectively). The fractions have, as their respective denominators, the corporation’s total receipts, property, and payroll (including the corporation’s share of the partnership’s total receipts, property and payroll, respectively). The single allocation factor is then multiplied times the corporation’s entire net income, including its distributive share of partnership income, and the amount so determined constitutes entire net income used to calculate the corporation’s CBT liability. N.J.A.C. 18:7-7.6(g)(2) and Example III. See also Technical Bulletin-3, supra.
Under the facts before me, I infer that, under the separate entity method, the allocation factor by which the Partnership’s income would be multiplied to determine plaintiffs share of Partnership income taxable in New Jersey would be larger than the allocation factor by which plaintiffs income (including income from the Partnership) would be multiplied under the flow through method. That is, the denominator of the flow through method allocation factor would be larger in relation to the numerator than would be the case for the separate entity method allocation factor calculated for the Partnership alone. I further infer that this *545 would occur because the sales fraction included in plaintiff’s flow through method allocation factor would be reduced by plaintiffs substantial non-Partnership revenues derived from business outside New Jersey, and because plaintiffs property and payroll fractions would be significantly smaller than its sales fraction. Consequently, under the flow through method, the amount of plaintiffs distributive share of Partnership income allocated to New Jersey would be lower than the amount allocated under the separate entity method.
Plaintiffs contention that the flow through method should be used is based on Technical Bulletin No. 3, issued by the Division of Taxation on June 21, 1991, and published in State Tax News. N.J. Div. of Taxation, 20 State Tax News, May/June 1991 at 49-51. The Bulletin states that the Division generally treats a partnership as a separate entity from its partners and that, consistent with this theory, “the only item that a corporate partner may reflect in its New Jersey allocation factor is the partner’s distributive share of partnership income.” The Bulletin then sets forth circumstances under which the flow through method may apply:
In a particular instance a partnership may be so integrated with a corporate taxpayer’s business and/or the entity theory may lead to such a distortion or elimination of the entire net income of the corporate partner that either the taxpayer or the Division may look through the entity to the partnership’s nexus and/or apportionment factors under an aggregate approach.
In such a situation, nexus may exist by virtue of the partnership’s activities in New Jersey, and the receipts, property and payroll of the partnership may be included in a corporate taxpayer’s fractions of its allocation factor.
Facts that either singly or in combination may suggest that a flow-through approach may be appropriate include:
• substantial intercompany-partnership transactions;
• the partnership interest is the only or the most substantial asset of the corporation, or the partnership interest produces all or most of the income of the corporation;
• the corporation and partnership are in the same line of business;
• Substantial Overlapping Employees And Officers;
• sharing of operational facilities, technology and/or know-how.
[New Jersey Division of Taxation, Technical Bulletin-3, Issued June 21, 1991 and expiring June 30,1992.]
In 1997, after the last year under appeal in this matter, the Director incorporated the contents of the Technical Bulletin into *546 his regulations under the CBT Act. N.J.A.C. 18:7-7.6(g). 29 N.J. Reg. 1686(a) and 4327(a) (1997).[4]
Plaintiff contends that it and the Partnership are integrated, and, therefore, the requirements of the Technical Bulletin use of the flow through method are satisfied. Specifically, plaintiff contends that it satisfies the five factors set forth in the Bulletin as follows: 1) the sales by plaintiff to the Partnership of antigens and antibodies constitute substantial intercompany-partnership transactions; 2) the Partnership interest produces most of plaintiffs income, representing between 38% (for 1993 and 1994) and 50% (for 1992) of its gross income and between 180% and 608% of its net income (plaintiff having suffered losses on other aspects of its business); 3) plaintiff and the Partnership are in the same line of business, that is, developing tests to be used for detecting HCV and HIV; 4) there is substantial overlapping of employees and offices because three of plaintiffs senior executives serve as members of the six-member supervisory board, and employees of plaintiff performing their work for it are simultaneously performing work which benefits the Partnership; and 5) the Partnership and plaintiff share technology and/or know-how as evidenced by the licenses granted by plaintiff and ODS to each other under the 1989 Agreement and their continuing every day business relationship in developing and marketing Products.
The Director contends that plaintiff fails to satisfy any of the five factors for the following reasons: 1) the sales of antibodies and antigens by plaintiff to the Partnership do not constitute the type of intercompany-partnership transactions contemplated by the Technical Bulletin; 2) although, at least on a net income basis, plaintiffs interest in the Partnership produces most of its revenue, if plaintiffs other business ventures become profitable, then plaintiff will no longer have most of its revenues derived from the Partnership; 3) plaintiff and the Partnership are not in the same line of business, with plaintiffs business being research and *547 development of antigens and antibodies and the Partnership’s business being the use of those antigens and antibodies to develop, produce and market blood testing kits; 4) the service of three of plaintiffs senior executives on the Partnership’s supervisory board does not constitute a substantial overlapping of employees or officers and plaintiffs employees do not work for the Partnership; 5) there is no use by plaintiffs employees or officers of any offices which are also used by the Partnership; and 6) the sharing of technology and know-how is limited to the specific purposes of the 1989 Agreement and there is no general agreement to share technology and know-how by plaintiff or by ODS.
The Technical Bulletin states that the factors articulated by the Director “either singly or in combination may suggest” that the flow-through approach “may be appropriate.” Although I conclude that the relationship between plaintiff and the Partnership is such as to satisfy more than one of the factors in the Bulletin, I also conclude that, given the non-definitive language of the Bulletin (“may suggest” and “may be appropriate”), the factors are merely indicators that the Division will consider. The critical issue is whether the corporate partner and the partnership are “integrated” and parts of a “unitary business.” See N.J.A.C. 18:7-7.6, Example III (applying the flow-through method when a corporation is “unitary with a partnership” and “there is a sufficient integration of assets and business activities”). Here, for the reasons discussed below, the relationship between plaintiff and the Partnership is not unitary or integrated. Therefore, plaintiff does not qualify for use of the flow through method.
The Technical Bulletin factor most obviously satisfied is the second, relating to the derivation of most of plaintiffs revenue from the Partnership. The Director is correct that plaintiffs receipts from other ventures may change and may diminish the significance of the revenues from the Partnership, but, during the years under appeal, those revenues were the most significant element of plaintiffs total revenue picture, both on a gross and net basis. The relationship between plaintiff and the Partnership also satisfies the fifth factor relating to sharing of technology. The sales of antigens and antibodies by plaintiff to the Partnership *548 could satisfy the first factor relating to substantial intercompany-partnership transactions but I need not decide that issue.
Other factors set forth in the Bulletin are not satisfied and suggest a lack of integration between plaintiff and the Partnership. Plaintiff and the Partnership are not in the same line of business (the third factor). Viewed from the perspective of the Partnership, plaintiffs business simply is one aspect of the Partnership’s business, namely, providing research and supplying antigens and antibodies. Plaintiff is not in the business of producing blood testing kits and marketing them throughout the world. Its inability to do so is precisely the reason for its entering into a relationship with ODS. The relationship between plaintiff and the Partnership does not satisfy the fourth factor relating to substantial overlapping of employees and offices (or officers). As indicated above, plaintiffs employees do not use offices of the Partnership. The Partnership’s offices are the offices of ODS and are used by ODS personnel. The service by three executives of plaintiff on the supervisory board does not constitute a substantial overlapping of employees or officers. That work performed by plaintiffs employees and officers also benefits the Partnership does not mean that the employees or officers are working on behalf of the Partnership. Their employment is by plaintiff, and their work is directed by plaintiff.
The lack of integration between plaintiff and the Partnership is confirmed by the 1989 Agreement. As described above, the Agreement imposes on plaintiff significant obligations while imposing very few, if any, obligations on ODS. Plaintiff is obligated to provide to ODS the Partnership’s requirements for antigens and antibodies, as determined solely by ODS. ODS has no obligation to have any such requirements, but does have a general obligation of good faith under the Agreement. Under the October 12, 1993 amendment, ODS no longer has any obligation to purchase any antigens or antibodies from plaintiff. ODS has no obligations under the Agreement to use its best efforts to produce and market blood testing kits using antigens and antibodies provided by plaintiff.
*549 As to management of the Partnership, the Agreement provides, as described above, that, if the members of the supervisory board cannot agree on a budget or strategic plan for the following year, in most circumstances ODS alone has the right to make the budgetary decisions and develop the plan, including the right to change the allocation of responsibilities between the parties subject to plaintiffs retaining research responsibilities. See Chiron Corp. v. Ortho Diagnostic Systems Inc., 207 F.3d 1126 (9th Cir.2000) (discussing an arbitrator’s award enforcing a decision by ODS under the 1989 Agreement with which plaintiff disagreed). Under certain limited circumstances, a neutral third party may be required to make decisions in the event of a deadlock, but, generally, if the business venture is successful, ODS retains total control of the budget and strategic plan, the two most critical elements of the business operation.
Not only does plaintiff have limited management rights under the 1989 Agreement and far greater responsibilities and obligations than ODS, but also plaintiff has the express right under the Agreement (as does ODS) to continue with other business ventures not involving the sale of antibodies and antigens as contemplated by the Agreement. As financial figures submitted by plaintiff indicate, the Partnership’s operations represent no more than one-half of plaintiffs gross revenues.
The Partnership represents a successful business venture by plaintiff, but plaintiff has not relinquished its independence and does not have a position of parity with ODS in terms of obligations and rights under the 1989 Agreement. In no sense, therefore, can plaintiff be deemed or viewed as unitary or integrated with the Partnership. Consequently, even though several of the factors permitting use of the flow through method appear to be satisfied, I conclude that use of the method would be inappropriate and would result in a distortion of the sales fraction and thus plaintiffs allocation factor. See N.J.S.A. 54:10A-10 (authorizing the Director to adjust entire net income allocable to New Jersey, and other items, in order to make “a fair and reasonable determination of the amount of tax payable under [the CBT] act.”). The separate entity approach, as generally applicable under the Di *550 rector’s Technical Bulletin and later regulation, does not result in a distortion of the sales fraction, and thus does not result in a distortion of the allocation factor to be used by plaintiff for purposes of calculating its CBT obligations to this State.
IV.

The Abbott Royalties

The remaining issue presented by plaintiffs appeal is whether royalty revenues plaintiff received from the Abbott sublicense are includable in the numerator of plaintiffs sales fraction. Plaintiff does not dispute that royalties from a sublicense can be taxed in New Jersey. See N.J.A.C. 18:7 — 8.11(a)(2) (“Receipts from royalties include all amounts received by the taxpayer for the use of patents or copyrights, whether or not such patents or copyrights were originally issued to or are owned by the taxpayer.”). Plaintiff contends that, under the express language of N.J.S.A. 54:10A-6(B)(5) (requiring inclusion in the sales fraction of “royalties from the use of patents ... within the State”), royalty revenues are allocable to New Jersey only if a patent is used in this State for production of goods. Plaintiff asserts that Abbott used the patents and know-how sublicensed to it for production of blood testing kits in Illinois, and, therefore, the royalties that Abbott paid do not constitute New Jersey revenue. In support of its position, plaintiff cites the Director’s treatment, as New Jersey revenue, of royalties payable to plaintiff by Merck & Co. and Ethicon, both located in New Jersey. Plaintiff describes Abbott’s payments to ODS in New Jersey as reflecting administrative convenience which should not be the basis for treating plaintiff’s share of the Abbott royalties as New Jersey revenue. Plaintiff describes Abbott’s direct payments to it, pursuant to the Abbott Agreement, as confirming the use of plaintiffs patents and technology in Illinois.
The Director does not dispute that Abbott used, in Illinois, the patents and know-how covered by the sublicense but contends that the Partnership’s use, in New Jersey, of the license from plaintiff for the manufacture of blood testing kits and in connection with *551 the agreement with Abbott is sufficient to characterize the Abbott royalties as New Jersey revenue. The Director asserts that the sublicense to Abbott was merely an aspect of the “use” in New Jersey of plaintiffs patents and know-how, with the other aspect of the use being the manufacture and marketing of blood testing kits. I conclude that, because N.J.S.A. 54:10A-6(B)(5) designates royalties as a separate and independent category of receipts in calculating the sales fraction, I should analyze the Abbott royalties revenue separately from, and independently of, revenue generated by any other use of plaintiffs patents and know-how. For the reasons set forth below, I further conclude that the Abbott royalties revenue is generated by Abbott’s use, in Illinois, of plaintiffs patents and know-how under the sublicense from the Partnership. Consequently, the royalty revenue is not includible in the numerator of plaintiffs sales fraction.
No reported case in New Jersey has interpreted what constitutes a “use” of a patent under N.J.S.A. 54:10A-6(B)(5). The Director’s regulation states that a patent “is used in New Jersey to the extent that activities thereunder are carried on in New Jersey.” N.J.AC. 18:7-8.11(a)(3). Plaintiffs contends that the “activities” to which the statute and regulation refer must involve production of goods using the licensed patents and know-how. This contention is consistent with the following definition of “use” of a patent in the Uniform Division of Income for Tax Purposes Act (UDITPA)[5] for purposes of determining whether income should be allocated to a state: “A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a *552 patented product, is produced in the state.” UDITPA § 8(b), 7 U.L.A. 167 (2002). See also Jerome R. Hellerstein and Walter Hellerstein, State Taxation, supra, at ¶ 9.08 (discussing UDITPA).
The royalty revenue under Abbott’s sublicense from the Partnership was generated, for the years under appeal, in Illinois by Abbott’s use of plaintiffs patents and know-how to manufacture blood testing kits. The Partnership’s role in the arrangement with Abbott was a passive one. The Partnership, through ODS, granted the sublicense, and, through ODS, received from Abbott and distributed to plaintiff and ODS the royalty revenue from Abbott (other than the amounts Abbott paid directly to plaintiff). These activities do not constitute a “use” of plaintiffs patents and know-how in New Jersey within the meaning of N.J.S.A. 54:10A-6(B)(5) or N.J.A.C. 18:7-8.11(a)(3).
Our Supreme Court has held that, in deciding whether income is taxable in New Jersey, a court should determine the “real source” of the income. Avco Financial Services Consumer Discount Co. One, Inc. v. Director, Div. of Taxation, 100 N.J. 27, 36, 494 A.2d 788 (1985), Cf. Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138, 162, 773 A.2d 674 (2001) (interpreting N.J.S.A. 54:10A-6(B)(6) to require inclusion in the numerator of the sales fraction of revenue attributable to sales in New Jersey to a New Jersey purchaser even though the New Jersey seller shipped the products directly to out-of-state customers of the purchaser). The real source of plaintiffs income with respect to the Abbott sublicense is Abbott’s manufacturing and marketing operations in Illinois. The royalties Abbott pays, therefore, are not New Jersey income and may be excluded from the numerator of plaintiffs sales fraction.
Based on the preceding analysis and discussion, defendant’s motion for summary judgment is granted as to the partnership status of the joint business between plaintiff and ODS and as to the non-applicability of the flow through method, but the motion is denied as to the inclusion of the Abbott royalty revenue in the numerator of plaintiffs sales fraction. Plaintiffs motion for summary judgment is denied as to the partnership and flow through *553 issues, but is granted as to the non-inclusion of the Abbott royalty revenue in the numerator of plaintiffs sales fraction.

 The applicable New Jersey statutes use the terms "allocate” and "allocation.” N.J.S.A. 54:10A-6 and -6.1a. In his regulations, the Director has used "allocation,” N.J.A.C. 18:7-7.1, -7.3, -7.4 and -7.5, and "apportionment." N.J.A.C. 18:7-7.6. The distinction between apportionment and allocation is significant under some circumstances. See Jerome R. Hellerstein and Walter Hellerstein, State Taxation § 9.01 n.2 (3d ed.2001-2003) where the authors state as follows:
The terms "allocation" and "apportionment" are sometimes used interchangeably in state statutes and decisions in referring to the formulary method of dividing income or other tax measures. Most state statutes, however, ... distinguish the two terms. In these states, "allocation" refers *531 to the attribution of a particular type of income to a designated state, whereas "apportionment" refers to the division of the tax base by iormula.
In New Jersey "allocation" and "apportionment" are used interchangeably. In this opinion, I use the "allocation” terminology of N.J.S.A. 54:10A-6 and -6a.

 The allocation factor, the function of which is to allocate corporate income to New Jersey under the CBT Act, consists of a sales fraction, property fraction, and payroll fraction. N.J.S.A. 54:10A-6. In this matter, only the sales fraction is in issue. No proofs were presented as to the property and payroll fractions.

 In 1995, the formula for calculating the allocation factor was modified to give double weight to the sales fraction'. L. 1995, c. 245, § 1.

 The regulation refers to a "substantial overlapping of employees and offices" not officers. Compare N.J.A.C. 18:7-7.6(g)(3)(v) with New Jersey Division of Taxation, Technical Bulletin-3, issued June 2, 1991 and expiring June 30, 1992.

 This Act, with a wide variety of amendments, has been adopted in twenty-four states and the District of Columbia, but not in New Jersey. The purpose of UDITPA was to establish a “uniform method of division of income for tax purposes among the several taxing jurisdictions” in order to assure "that a taxpayer is not taxed on more than its net income.” Unif. Div. of Income for Tax Purposes Act, Prefatory Note, 7 U.L.A. 142 (2002). The Act is applicable to "[a]ny taxpayer having income from business activity which is taxable both within and without [a] state.” Id. § 2, at 155. The income allocated to a state equals the average of a property factor, payroll factor, and sales factor. Id. § 9, at 168.