72 N.J. Super. 438 (1962)
178 A.2d 671
GEORGE WITTNER AND HENRY W. WITTNER, COPARTNERS DOING BUSINESS AS MERCHANTS STANDARD TRADING COMPANY, PLAINTIFFS-RESPONDENTS,
v.
HENRY W. METZGER AND LOUIS METZGER, TRADING AS COMMERCIAL UNION COMPANY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1961.
Decided February 23, 1962.
*440 Before Judges GOLDMANN, FOLEY and ROSEN.
Mr. John Drewen argued the cause for the appellants (Mr. Benjamin Gross, attorney; Mr. Drewen, of counsel and on the brief).
Mr. Harry A. Margolis argued the cause for the respondents (Mr. Max L. Rosenstein, attorney; Mr. Margolis, of counsel and on the brief).
The opinion of the court was delivered by ROSEN, J.C.C. (temporarily assigned).
In a contract action, tried without a jury in the Superior Court, Law Division, defendants seek to reverse a judgment in favor of plaintiffs in the sum of $13,003.97.
Plaintiffs George Wittner and Henry W. Wittner, copartners, doing business as Merchants Standard Trading Company in New York City (hereinafter referred to as Wittners), and defendants Henry W. Metzger and Louis Metzger, trading as Commercial Union Company in Newark, New Jersey (hereinafter referred to as Metzgers), deal in the factoring and purchase of accounts receivable. Wittners had a master agreement with each of two mercantile companies, Metropolitan Home Equipment Co. (Metropolitan) and Atlas Credit Corp. (Atlas). Pursuant to said agreements, Wittners purchased commercial paper and accounts receivable from Metropolitan and Atlas at a specific rate and percentage basis, in accordance with schedules supplied to them by the two companies. When the schedules were obtained by Wittners, they discounted a certain portion of them and thereupon paid Metropolitan and Atlas. Thereafter, Wittners endeavored to collect on these receivables. Under each master agreement, Wittners purchased the "instruments" listed in the schedules accompanying the master agreements. The instruments consisted of "scheduled notes, *441 accounts receivable and other collateralized obligations." Wittners and Metzgers entered into two agreements dated August 22, 1950 and September 20, 1950, respectively, providing for their joint participation in the financing of the said instruments. In the Metropolitan agreement Metzgers' participation was 40%, and in the Atlas agreement 50%. In all other relevant respects the agreements are identical.
The agreements provided for Metzgers' participation in the Wittners' "factoring operations" with Metropolitan and Atlas "with respect to schedules," under the master agreements. Copies of the master agreements were to be made available to Metzgers. Wittners were to conduct the factoring transactions solely in their own name, and Metzgers were to refrain from any contact or communication with Metropolitan and Atlas, since the business with the two companies originated with Wittners. Upon Metzgers' request, Wittners were obligated to furnish them with copies of the "documents" and "statements" involved in these factoring transactions and to permit Metzgers to examine Wittners' books respecting the transactions with Metropolitan and Atlas.
In each instance Metzgers accepted a participation share in schedules purchased by the Wittners, in accordance with the percentage figure contained in the agreements, and were to receive the same percentage of remittance from said schedules, less a specified reserve. Wittners were to account at stated intervals to the Metzgers upon receipt of remittances from the "instruments" described in the schedules.
Paragraph 4 of the agreements provided that:
"In the furtherance of our [Metzgers'] participation, you [Wittners] hereby assign to us an undivided 40% [50% in the Atlas agreement] interest in and to said Schedule, and in and to the Instruments, collateral, rights and guarantees held by you with respect to said Schedules; and you shall execute, upon our request, such further documents as may be required to evidence our said interest. In addition you shall make upon your books and records or ledger sheets appropriate notations reciting the percentage of our participation in said Schedules. You shall occupy the status of a trustee for our benefit with respect to said Schedules so participated in by us." (Emphasis supplied)
*442 Wittners further agreed to conduct transactions with Metropolitan and Atlas in accordance with "sound factoring practice * * *." If Wittners sold their factoring business they were to pay Metzgers their participation percentage of the open balance of the Metropolitan and Atlas schedules. The agreements provided that neither party had any proprietary interest in the general business of the other.
Pursuant to the agreements, Wittners did engage in transactions with Metropolitan and Atlas, making the agreed remittances to Metzgers. However, in May 1951 and April 1952, respectively, Metropolitan and Atlas were declared bankrupts in the federal courts in New York. The respective trustees in bankruptcy instituted proceedings in New York against Wittners to have certain accounts receivables and payments thereon, received by Wittners within the four months prior to bankruptcy, declared as preferences and returned to the bankrupt estates. The trustee of Metropolitan sought the sum of $197,000, and the Atlas trustee the sum of approximately $276,800, for total claims in excess of $473,800. The suits were opposed by Wittners, and counsel was retained to defend in each case. The Wittners notified the Metzgers of the pendency of these suits and requested Metzgers to assist in the defense, but the Metzgers remained silent.
The record discloses that the details of the individual accounts receivable purchased by Wittners pursuant to the master agreement were never furnished Metzgers. However, it is conceded that the Metzgers participated in the purchase of the receivables alleged by the bankruptcy trustees to have been preferences, and received their proportionate share of the proceeds collected from said receivables.
Although Wittners denied taking the preferences they ultimately settled the litigation for $2,000 (Metropolitan) and $15,000 (Atlas). Contribution sought by them totals $8,300, $800 representing 40% of the $2,000 Metropolitan settlement and $7,500 representing 50% of the $15,000 Atlas settlement. Counsel fees in defense and settlement *443 of said suits, in the amounts of $3,507.80 and $6,601.70, respectively, were paid by Wittners. The total contribution sought by Wittners in this category is $4,703.97, $1,403.12 representing 40% of the counsel fees in the Metropolitan action and $3,300.85 representing 50% of the counsel fees in the Atlas action. Wittners postulate that these payments were "losses" which should be borne proportionately by Metzgers.
Paragraph 2 of the agreements provided that:
"With respect to the Schedule of Instruments above-mentioned, you [Wittners] may in your discretion offer us and we [Metzgers] hereby accept a 40% [50% in the Atlas agreement] participation therein, and we hereby pay to you for such participation 40% of the net amount of said schedule, less our charge of 7% (Net Amount as used above is understood to be the unpaid face amount of the schedules less a reserve of 20%). Any loss sustained with respect to said Schedules shall be borne by you and by us in proportion to our respective percentages of participation." (Emphasis supplied)
The trial court held that Wittners and Metzgers entered into a joint venture, and gave judgment according to the stated proportions for Wittners' aforementioned payments in the total sum of $13,003.97, without costs. Proportionate indemnity for fees paid to Wittners' counsel in the instant litigation was denied. Wittners do not cross-appeal from this determination.
Metzgers contend that the agreements do not establish a joint venture but are contracts of indemnity. In essence, they claim that they purchased only a participation in the "remittances," i.e., only the collections.
The sine qua non of joint venture is a contract purposefully entered into by the parties. The joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly ex contractu, express or implied. 2 Williston, Contracts (3d ed. 1959), § 318A, p. 556 et seq.; 30 Am. Jur., § 7, p. 943. The joint venture concept has undergone noticeable judicial attention. Jaeger, "Joint Ventures: Origin, Nature and *444 Development," 9 Am. U.L. Rev. 1 (1960); Taubman, "What Constitutes a Joint Venture," 41 Cornell L.Q. 640 (1957). In addition to the requirement that there must be a contractual basis for the joint venture, certain requisites have been deemed essential. There is substantial agreement that some or all of the following elements, as summarized by Professor Williston, must be present:
(A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;
(B) A joint property interest in the subject matter of the venture;
(C) A right of mutual control or management of the enterprise;
(D) Expectation of profit, or the presence of "adventure," as it is sometimes called;
(E) A right to participate in the profits;
(F) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise.
Williston, supra, § 318A, at pp. 563-565.
In this State a joint venture has been defined as "A special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation," and "a joint adventure is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." Kurth v. Maier, 133 N.J. Eq. 388, 391 (E. & A. 1943); Kahn v. Massler, 140 F. Supp. 629 (D.N.J. 1956), affirmed 241 F.2d 47 (3 Cir. 1957). Between the parties to a joint venture, a common element is a fiduciary relationship. Wiley v. Wirbelauer, 116 N.J. Eq. 391 (Ch. 1934); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (Ct. App. 1928).
In Cooperstein v. Shapiro, 122 N.J. Eq. 238, 241 (E. & A. 1937) the court said:
"A joint adventure is not dissimilar to a partnership * * *; the character of the relationship being more informal and usually limited to a single transaction although the conduct of the particular business may continue for a number of years. * * * The contract between the parties establishing the joint adventure need contain no particular form of expression nor is formality of execution *445 necessary. It may be express or may be implied in whole or in part from the conduct of the parties. * * * The right to equality of profits may be changed by contract between the parties. * * *"
See also, Stein v. George B. Spearin, Inc., 120 N.J. Eq. 169 (Ch. 1935); Jackson v. Hooper, 76 N.J. Eq. 185 (Ch. 1909), reversed (on other grounds) 76 N.J. Eq. 592, 27 L.R.A., N.S. 658 (E. & A. 1909); Jaeger, "Partnership or Joint Venture," 37 Notre Dame Law. 138 (1961).
Whether the parties have created the relationship of a joint venture depends upon their intention in accordance with the ordinary rules governing the interpretation and construction of contracts. 2 Williston, above, at p. 556 et seq. These rules have been articulated in West Caldwell, Borough of v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958):
"The tokens of intention are to have a reasonable interpretation, taken and compared together in the context of circumstances. A contract is an agreement resulting in obligation enforceable at law. It is basic to an agreement entailing obligatory jural consequences that the parties have a distinct intention common to both; * * *. The writing is to have a reasonable interpretation. Disproportionate emphasis upon a word or clause or a single provision does not serve the object of interpretation. The general purpose of the agreement is to be considered in ascertaining the sense of particular terms. The literal sense of particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention. It is the revealed intention that is to be effectuated, the sense that would be given the interpretation by a reasonably intelligent person."
In the instant case the parties contributed their proportionate share of money to the common undertaking of purchasing schedules or instruments consisting of notes, accounts receivable and other collateralized obligations from Metropolitan and Atlas. Metzgers received an assignment of their participating share in and to the "Schedules, * * * Instruments, collateral, rights, and guaranties" with respect to said schedules. Metzgers possessed a joint *446 property interest in the subject matter of the venture with Wittners. Metzgers expected a profit from the venture, and the agreements provided that they receive weekly remittances for their participating share. Each of the two agreements provided that "any loss sustained" with respect to the schedules was to be borne in proportion to the respective percentage of participation. Metzgers had the right to examine Wittners' books and records reflecting the transactions with Metropolitan and Atlas. Metzgers agreed that the "factoring transactions" be conducted solely in Wittners' name, and they were to refrain from any contact or communication with Metropolitan or Atlas. However, Wittners were required to furnish Metzgers with copies of the documents and statements involved. Metzgers agreed that the management of the venture was to reside with Wittners. This arrangement is consonant with the concept of a joint venture. A joint adventurer may entrust actual control of the operation to his coadventurer and it still remains a joint venture. Shell Oil Company v. Prestidge, 249 F.2d 413 (9 Cir. 1957), rehearing denied (1957); cf. Stein v. George B. Spearin, Inc., above, 120 N.J. Eq., at p. 176; Cooperstein v. Shapiro, above, 122 N.J. Eq., at p. 241; Braddock v. Hinchman, 78 N.J. Eq. 270 (E. & A. 1910); Meinhard v. Salmon, above, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 (Ct. App. 1928); 30 Am. Jur., § 40, p. 967.
Metzgers' view of the agreements is too narrow. In Matlack v. Arend, 2 N.J. Super. 319, 325 (Ch. 1949), Judge Jayne said:
"Contracts ought to be interpreted according to that meaning which is distinctly discernible to persons of common sense and understanding and not too submissively to profound legalistic processes which may in a practical adaptation distort and perhaps frustrate the genuine intentions of the parties."
A consideration of the salient provisions of the agreements persuades us to conclude that all of the essential requisites of a joint venture are present. The Metzgers *447 participated in the purchase of the receivables alleged by the bankruptcy trustees to have been preferences, and received from Wittners their proportionate share of the proceeds collected from said receivables. There is no dispute that the Wittners acted in good faith when they purchased the schedules or instruments from Metropolitan and Atlas, and remitted to Metzgers their proper share of the proceeds collected from the accounts receivable. The Metzgers received the profit with respect to the schedules during the claimed preference period. It was the revealed intention of the parties that they participate in "any loss sustained with respect to said Schedules" in proportion to their respective percentages of participation. The reasonableness of the settlements between Wittners and the trustees in bankruptcy is not in question. Wittners are entitled to recover $8,300 from Metzgers, $800 representing 40% of the $2,000 Metropolitan settlement, and $7,500 representing 50% of the $15,000 Atlas settlement.
Metzgers take the position that the counsel fees paid by Wittners in defending the actions brought by the trustees in bankruptcy are not "losses sustained with respect to said Schedules." Wittners on their part, argue that the "very nature of the entities financed" bespeaks the probability of a poor liquid position and the "always present danger of insolvency and its subsequent proceedings"; that "factoring entities must and do predicate their charges and methods of operation with an eye toward these always present dangers." The record is devoid of any proof or testimony to substantiate these statements. The placing of commercial instruments such as accounts receivable and negotiable notes in quantity by an original holder into other ownership, usually for final liquidation, is an accepted practice in our present-day business world. Highly solvent companies daily resort to factoring their accounts receivable or other commercial paper in order to achieve or maintain a liquid position.
Paragraph 6 of the agreements provided for Metzgers to reimburse Wittners for the formers' share of "any expense, *448 legal fees, or other disbursements * * *, incurred by you with respect to said Schedules to the extent to which you are unable to recover the sum from the Customer." It is clear from the language in this clause that it was intended to deal with Metzgers' responsibility for reimbursement to Wittners for expenditures of legal fees and expenses to enforce collection of the schedules or instruments. There is no specific clause in the agreements imposing upon Metzgers the legal obligation to reimburse Wittners for any other legal fees.
Wittners had the sole power to control the business operations. Wittners were more than coadventurers; they were managing coadventurers. They conducted the factoring transactions solely in their own name and held the exclusive reins of management in the operations. They received a 7% service charge for handling the accounts. As managing coadventurers Wittners were bound to perform their duties in fulfillment of their promise to Metzgers to handle the accounts or instruments in accordance with sound business practices.
Metzgers were under no legal duty to participate in the defense of the trustees' respective suits. The agreements confirm "the arrangements" between the parties for Metzgers to participate in factoring operations. Apparently Wittners and Metzgers did discuss legal fees and provided for the same in paragraph 6 of the agreements. These parties possessed experience and knowledge in the factoring business. In Paragraph 2 of the agreements they provided for "any loss sustained with respect to said Schedules," but did not specifically mention or include legal fees. If it was the intention of the parties to include legal fees within the phrase "any loss," it seems clear that the parties, wise in the ways of factoring operations, would have expressed and revealed their intention in unequivocal language. The phrase "any loss sustained with respect to said Schedules" cannot, in any reasonable interpretation of the agreements, be construed to include legal fees paid by Wittners in *449 defense of the trustees' suits. Cf. Textileather Corp. v. American Mut. Liability Ins. Co., 110 N.J.L. 483 (E. & A. 1933). Wittners are not entitled to contribution for legal fees in the sum of $4,703.97.
The matter is remanded to the Superior Court, Law Division, for entry of judgment in favor of the plaintiffs and against the defendants in the sum of $8,300, without costs. No costs on this appeal.