**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5098-17T1

THE HOLDER GROUP,
INC.,

    Plaintiff-Appellant,

v.

PIKE CONSTRUCTION CO.,
LLC, and JEFFREY L. ABRAMS,

    Defendants-Respondents.

_____

        Argued September 17, 2019 – Decided November 6, 2019

        Before Judges Yannotti, Hoffman and Currier.

        On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-4909-15.

        Jeffrey S. Mandel argued the cause for appellant.

        John D. Horowitz argued the cause for respondents.

PER CURIAM

    Plaintiff, a construction management firm owned by Andrew Holder, filed this action in July 2015, alleging that defendants breached a joint venture

agreement. Plaintiff appeals from Law Division orders granting summary judgment in favor of defendants and denying its motion for partial summary judgment. Plaintiff also challenges the trial court's rulings on various pretrial motions. For the reasons that follow, we affirm.

I.

In 2011, plaintiff made contact with The Pinnacle Companies (Pinnacle), a developer hired by DCH Montclair (DCH) to help obtain "new entitlements" for the construction of two buildings in Montclair (the Project); in addition, Pinnacle had the responsibility of selecting a general contractor who could competently provide preconstruction services. During an initial meeting, Holder informed Brian Stolar, Pinnacle's president, that "in order for [plaintiff] to participate in construction of [a] project of this magnitude[, plaintiff] would have to joint venture with somebody else that has bonding capacity and experience . . . ." Holder then contacted defendants, Pike Construction Co., LLC (Pike) and Jeffrey Abrams (Pike's part-owner), in an attempt to form a joint venture with Pike to compete for the Project.[1]

---

[1] At his deposition, Stolar testified he "had already been referred to" Pike by a partner.

A-5098-17T1

At his deposition, Holder testified that he called Abrams, and the two agreed

> that we'd be a joint venture partnership[;] that we would be 50/50 partners based on a concept that each [of the parties] would be responsible for their own respective home office expenses, including principals[;] that we'd be financially equally responsible for the [p]roject[;] that we would participate in terms of construction responsibilities on [an] equal basis[;] and that Pike would bring their bonding capacity to the [P]roject and [plaintiff] would make the introduction to the client.

It is undisputed there was never a written agreement between plaintiff and defendants, nor was there a written agreement between plaintiff and Pinnacle, or between the alleged joint venture and Pinnacle.

In a certification, Abrams recalled the phone call with Holder, but stated in his deposition that he "never agreed to the alleged terms proposed by Holder, as set forth." He stated the parties "had an understanding that we were pursuing the . . . [P]roject and other projects with Pinnacle together"; however, he "was skeptical of [plaintiff's] ability to perform and fully expected that [Pike] would end up carrying the ball . . . on this," because plaintiff did not "possess . . . the experience necessary to build a project like this or the financial capability . . . ." Abrams' partner, David Weiner, similarly testified that plaintiff lacked "the financial wherewithal" and "the experience" necessary to complete the Project.

A-5098-17T1

In May 2011, Holder and Abrams attended a preconstruction meeting with representatives of Pinnacle – a senior vice president at Pinnacle recalled walking "away with the understanding that [plaintiff] and Pike Construction were going to work together as joint venture partners." In June 2011, plaintiff emailed Abrams a two-page document titled "division of responsibility," which consisted of a chart connecting plaintiff and Pike to Pinnacle through a "joint venture partnership"; the document also provided a check list regarding project administration.

However, at his deposition, Stolar dismissed the "division of responsibility" document as

> a list with checks on it . . . [eighty] percent of the checkmarks are in both [plaintiff's and Pike's] columns. . . . [T]here were . . . dark checks and light checks. I'm like, what's the dark check and the light check? And the dark check is more emphasis and the light check is less emphasis, and with all due respect I'm building a very expensive project and I need a little more specificity . . . .

Stolar certified that "Pinnacle was not going to agree to the 'division of responsibility' . . . therefore, that entire document became meaningless, and I do not believe that it was ever discussed again."

At his deposition, Stolar stated that once Holder said he did not have the bonding capacity to perform the Project, it "became a clear undeniable inability

to work on this project," and "because he never worked on a project of anything like this scale[, Pinnacle] would not consider him to work on [the] [P]roject."[2] Stolar did not believe plaintiff and defendants were engaged in a joint relationship.

According to plaintiff, on "September 1, 2011, [plaintiff] provided [d]efendants with . . . budget estimates for the project." Plaintiff cites to an email from an employee of plaintiff to Weiner, with "attached information regarding the budget estimates for [t]he Pinnacle [c]ompanies." None of the attachments are included in the record, and defendants point out the "[a]ttachments" section of the email included a document titled "Westfield ground floor sketch plan." According to defendants, "Westfield" is a wholly different (and much smaller) project than the Project at issue here. Thus, defendants argue plaintiff's claim that plaintiff "provided . . . budget materials for the project" "is a provably <u>false</u> representation."

Stolar also certified that "[o]n or about January 24, 2012, a [plaintiff] employee sent [Pinnacle] an email suggesting that Pinnacle had verbally agreed

---

[2] Prior to 2013, plaintiff had served on only six out-of-the-ground construction projects – those requiring excavation – and none exceeded $5,000,000 in contract price. In contrast, Pike had served as a general contractor for more than thirty years, during which it completed out-of-the-ground construction projects ranging from $10,000,000 to $150,000,000.

to pay . . . a fee for preconstruction services, which was not correct." According to Stolar, "Contrary to [plaintiff's]'s assertion, there was a specific verbal agreement among Pinnacle, Pike and [plaintiff], that Pike and [plaintiff] were not charging Pinnacle any preconstruction fees." Later that day, "Holder apologized for [plaintiff] having wrongfully claimed that Pinnacle verbally agreed to pay for preconstruction fees, when no such fee existed – and in fact, the exact opposite agreement was reached between" the parties and Pinnacle.

Notwithstanding Holder's apology, Stolar felt plaintiff's email "reflected [plaintiff's] lack of credibility, and at that point . . . [he] decided [he] did not want [plaintiff] to have any meaningful involvement in the Project." Stolar responded to Holder in an email stating, "We need [Abrams] to lead . . . . Your role is to make him better – but it has to be as HE sees fit. I leave it to your joint relationship to do so." Holder responded, "Agreed."

Stolar further certified that in "January 2012, Pinnacle had no obligation to hire Pike and/or [plaintiff] to serve as general contractor," and at that time, he "decided that Pinnacle was not going to sign a contract with [plaintiff], or with any joint venture that included [plaintiff], or consent to any arrangement whereby Pike and [plaintiff] were splitting the work in any meaningful way. . . ." Stolar stated he "was willing to allow Pike to assign minor tasks to [plaintiff],

6

subject to my review and approval, strictly as a courtesy to Pike since it was my understanding that . . . Abrams and . . . Holder were friends."  Overall, Stolar concluded that plaintiff "did not perform any meaningful work in furtherance of the Project, nor did [plaintiff] add any value to the Project."

In April 2013, Abrams asked Holder to provide "takeoffs" for the project – plaintiff defined takeoffs as "lists that identify how much material is required on the project and quantity/quality assessments."  Plaintiff provided twelve pages of "takeoff" material; however, David Topalian, a Pike employee, testified at his deposition that the takeoffs had to be re-done.  The record fails to indicate the amount of time or effort plaintiff spent in creating the takeoffs.

On May 9, 2013, during the preconstruction phase of the Project, MAP Urban Renewal, LLC (MAP) purchased the property from DCH.  LCOR Construction Services LLC, (LCOR) served as the developer for MAP in connection with the project.  Plaintiff concedes that after MAP closed on its purchase of the property, plaintiff never participated or worked on the project.

According to Holder, on May 16, 2013, Abrams sent him an email, stating in pertinent part:

> We have a fundamentally different impression of how this [P]roject has evolved.  As discussed several times since your introduction of Pike to Pinnacle and again during our most recent meeting, it is not feasible, or

equitable, for Pike to be the financially responsible party to a construction contract and to equally share the potential fees with another firm . . . .

On October 29, 2013, Pike entered into a Project Construction Agreement[3] with LCOR, and ultimately completed the construction of the buildings as the sole general contractor. In contracting with Pike, Lawrence Capelli, the Director of Development and Construction at LCOR, certified that "LCOR and MAP wanted one entity, in this case Pike, to be responsible for all of the general contractor's responsibilities, and did not want Pike's general contractor responsibilities to be delegated to anyone else."

Plaintiff's complaint alleged that defendants breached the parties' alleged joint venture agreement, and also asserted claims of conversion, fraud, breach of fiduciary duty, and breach of the duty of good faith. Plaintiff also sought an accounting of the Project and demanded compensatory and punitive damages.

In March 2017, plaintiff filed a motion for leave to file an amended complaint, seeking to add Pinnacle and Stolar as defendants under a theory of tortious interference. After finding the complaint would be futile, as the putative defendants would subsequently file a successful motion to dismiss for failure to

---

[3] According to Abrams, "The contract price for the Project, as amended, was in excess of $55,000,000, and MAP issued payments directly to Pike."

A-5098-17T1

state a claim, the trial court denied plaintiff leave to file an amended complaint. The trial court also entered an order on November 28, 2017, denying plaintiff's request for discovery of documents shown and notes taken by defendants' attorney during a meeting with a former Pinnacle employee, whom plaintiff later deposed. In addition, the court entered an order on January 5, 2018, denying plaintiff's motion for leave to compel depositions of four LCOR employees, more than a week after fact discovery closed.

Before trial, the parties filed summary judgment motions, which the Law Division decided on July 6, 2018. The motion judge granted defendants' motion, and entered an order dismissing plaintiff's complaint with prejudice. The judge dismissed plaintiff's cross-motion for summary judgment as moot. This appeal followed.

II.

Plaintiff argues that the motion judge erred by granting summary judgment in favor of defendants.

When reviewing an order granting or denying summary judgment, we apply the same standards that are applied by the trial court when ruling on a motion seeking such relief. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007); Henry v. N.J. Dept. of Human Servs., 204 N.J.

320, 330 (2010). Summary judgment shall be granted when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. R. 4:46-2(c).

Furthermore, "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid. Where the party opposing summary judgment points only to disputed issues of fact that are "of an insubstantial nature," the proper disposition is summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995). Where the evidence on a factual issue "is so one-sided that one party must prevail as a matter of law," the court "should not hesitate" in granting summary judgment. Id. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Plaintiff claims that defendants breached the parties' joint venture agreement when defendants completed the construction project as the sole general contractor. Plaintiff argues that a reasonable jury could find that the parties established a joint venture for the construction of the properties based on the facts in the record.

A-5098-17T1

A joint venture is "an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." Wittner v. Metzger, 72 N.J. Super. 438, 444 (App. Div. 1962) (quoting Kurth v. Maier, 133 N.J. Eq. 388, 391 (E. & A. 1943)). A joint venture ordinarily has some or all of the following elements: 1) a contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking; 2) a joint property interest in the subject matter of the venture; 3) a right of mutual control or management of the enterprise; 4) an expectation of profit; 5) the right to participate in profits; and 6) limitation of the objective to a single undertaking. Ibid.

To create a joint venture, the parties must agree upon essential terms because a "basic criterion" for the establishment of a joint venture is "the voluntary agreement of the parties to form a relationship with the intent to create a joint venture." Sullivan v. Jefferson, Jefferson & Vaida, 167 N.J. Super. 282, 290 (App. Div. 1979). "The sine qua non of joint venture is a contract purposefully entered into by the parties." Id. at 289 (quoting Wittner, 72 N.J. Super. at 443).

In a written opinion, the motion judge noted that a joint venture must include some, but not all, of the relevant factors set forth in Wittner. Regarding

the first factor, the judge found that plaintiff admits it was "unable to contribute money, property, effort, knowledge, skill or other asset to the common undertaking. Plaintiff's contribution to the joint venture seems to have been simply connecting Pinnacle with [d]efendant to perform the necessary work." The judge found no evidence of a joint property interest in the subject matter of the Project, and no evidence that either party had a right to control the venture.

The judge also found that while plaintiff claimed "an expectation of profits as being divided 50/50[,] [t]his expectation . . . must be coupled with the right to participate in profits." The judge determined that plaintiff lacked the right to participate in profits because there was no agreement to share any losses, noting, "Without an agreement to share in losses, there cannot be a joint venture." The judge stated that it was unclear whether the alleged joint venture was limited to a single undertaking.

Plaintiff points to various facts in the record to support its argument that a jury could find that the parties established a joint venture to construct the buildings together. We are not persuaded. Considering the record and the applicable law, we find this issue so one-sided that defendants must prevail as a matter of law. Brill, 142 N.J. at 540

12

Plaintiff's brief vaguely explains its actual participation in the Project: that plaintiff and defendants referred to themselves as a "joint venture"; that a senior vice president at Pinnacle understood that plaintiff and Pike would "work together as joint venture partners"; that plaintiff attended preconstruction meetings; that documents such as the "division of responsibility" labelled plaintiff and Pike as a "joint venture partnership"; that plaintiff worked with defendants on budget preparation; and that plaintiff prepared "takeoffs" for the project. However, evidence in the record indicates the "division of responsibility" plaintiff prepared was never used, and needed to be redone, and plaintiff's work on the "takeoffs" was done incorrectly and re-done by someone else. Also, the record does not include any documents that provide budget estimates.

Most importantly, where plaintiff attempts to provide examples of the work it performed on the Project, it fails to specify or substantiate the amount of time, money, personnel, resources, knowledge, or effort utilized in its alleged participation in the project. Thus, plaintiff fails to provide sufficient competent evidence for a rational factfinder to conclude that plaintiff satisfied the first element of a joint venture under Wittner. We agree with the motion judge's assessment that plaintiff's contribution to the alleged "joint venture seems to

13

have been simply connecting Pinnacle with [d]efendant to perform the necessary work."

Moreover, the record makes clear that the preconstruction stages of the project – the only period in which plaintiff alleges that it participated – were not events that occurred on behalf of a contract between the alleged joint venture and Pinnacle or LCOR. Plaintiff attempted to charge Pinnacle for "preconstruction fees," and Pinnacle rejected the billing because "there was a specific verbal agreement among Pinnacle, Pike and [THG], that Pike and [THG] were not charging Pinnacle any preconstruction fees." Clearly, neither plaintiff nor the alleged joint venture were ever involved in a contract or right to profits with any of the owners or developers on the Project – in fact the record shows the developers specifically avoided working with plaintiff.

We conclude that the motion judge correctly found plaintiff failed to present sufficient evidence to establish that it was part of a joint venture with Pike. Plaintiff failed to establish the elements generally required to prove the existence of a joint venture. Plaintiff did not make a substantial contribution to the venture, and lacked the relevant construction experience and bonding capacity for the project.

14

Furthermore, plaintiff's introduction of Pike to Pinnacle had little value because the record shows Stolar intended to contact Abrams at Pike before that introduction. There was no evidence that plaintiff and Pike had a joint property interest. The subject property was DCH Montclair's property, which sold the Project to MAP; at that time, LCOR took over for Pinnacle as developer for the project.

There was no agreement between plaintiff and Pike as to the control of the alleged joint venture. Indeed, the record shows that Stolar decided he did not want plaintiff to have any involvement in the project. There also was no agreement to share losses.

Plaintiff's assertion that the parties would be equally responsible financially for the project lacks sufficient support in the record. The assertion is also inconsistent with evidence that Pike would provide the bond required for the Project.

In addition, both our Supreme Court and this court have made clear that any losses incurred by a joint venture must be shared for there to be an enforceable joint venture contract. See Grober v. Kahn, 47 N.J. 135, 148 (1966) (no joint venture is formed if the parties do not agree to share in losses); Wittner,

72 N.J. Super. at 444-45 (venturers must share profits and losses to maintain an enforceable joint venture).

Based on the summary judgment record, a reasonable jury could not find that the plaintiff and defendants established a joint venture for the construction of the Project. In its reply brief, plaintiff concedes its remaining claims are all premised on the existence of a joint venture partnership. Since the judge correctly granted summary judgment in favor of defendants on the joint enterprise issue, the judge properly dismissed plaintiff's remaining claims as moot.

III.

Plaintiff also contends that the motion judge erred by denying: its motion for leave to extend discovery; its motion for leave to file an amended complaint; its request for documents from defendants' attorney's meeting with a former Pinnacle employee; and other related discovery motions.

A trial court's decision on discovery matters is reviewed under an abuse of discretion standard. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011) (citing Bender v. Adelson, 187 N.J. 411, 428 (2006)). "That is, '[w]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken

understanding of the applicable law.'" Ibid. (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005)).

The trial court did not abuse its discretion by refusing to order defendants to produce notes prepared by defense counsel during his meeting with Pinnacle Vice President Doug Bush. The meeting took place several months before plaintiffs deposed Bush. The court correctly found the notes constituted attorney work-product and therefore were not discoverable. Nor did the court err by denying plaintiff's request to obtain drafts of Stolar's affidavit, which defendants submitted in support of their summary judgment motion. Since plaintiff deposed Stolar, plaintiff had a full opportunity to obtain any needed information. In addition, the court did not err by quashing a subpoena to compel LCOR to produce certain documents. The subpoena was overbroad.

Plaintiff's counsel inexplicably waited until December 20 to file the motion for leave to depose four LCOR employees, returnable on January 5, 2018. The trial court denied the motion, stating that "[f]act discovery concluded on [December 28,] 2017 per [o]rder dated [November 11,] 2017." We discern no abuse of discretion.

We also find no reason to disturb the trial court's denial of plaintiff's motion to amend its complaint to add Stolar and Pinnacle as defendants. "Courts

are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law." Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 256-57 (App. Div. 1997) (quoting Mustilli v. Mustilli, 287 N.J. Super. 605, 607 (Ch. Div. 1995)). In determining plaintiff's amended complaint would be futile, the court found the putative defendants "never said[] or did anything, . . . to tortuously interfere . . . with the . . . suggested joint venture." Rather, they indicated "that they just simply didn't want to work with . . . [p]laintiff." Moreover, plaintiff's proposed amended complaint failed to allege any facts suggesting that Stolar or Pinnacle acted with malice, i.e., without excuse or justification, when they decided they did not want to work with plaintiff, particularly after receiving plaintiff's email claiming that Pinnacle verbally agreed to pay for preconstruction fees.

Any arguments not specifically addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5098-17T1