**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1813-18T1

STEVEN BATITSAS, and
DIANE SARAHWATI,

     Plaintiffs-Respondents,

v.

PARK POINT INVESTORS,
LLC,

     Defendant-Appellant.

_____

Argued July 15, 2020 – Decided November 13, 2020

Before Judges Suter and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-3156-16.

Andrew J. Kelly argued the cause for appellant (The Kelly Firm, PC, attorneys; Andrew J. Kelly, of counsel; Katherine B. Galdieri, on the briefs).

Joseph J. Dochney argued the cause for respondents (Joseph J. Dochney, LLC, attorneys; Jeff Thakker, of counsel; Daniel S. Popovitch, on the brief).

PER CURIAM

Defendant Park Point Investors, LLC, appeals the November 15, 2018 Law Division judgment for $439,626 entered against it in favor of plaintiffs Steven Batitsas and his spouse, Diane Sarahwati. We affirm the judgment, concluding defendant breached the duty of loyalty owed to plaintiffs in connection with their joint venture and breached the duty of good faith and fair dealing implied in their contract.

## I.

We relate the facts based on the evidence from the bench trial. In 2007, plaintiffs signed a note for $505,000 and a first mortgage to acquire a commercial property in the Borough of Palisades Park (the Palisades property). The next month, plaintiffs signed a note for $675,000 and executed a first mortgage for another piece of commercial property, this one located in the Borough of Point Pleasant (the Point Pleasant property).

In 2010, plaintiffs defaulted on both notes. The lender filed foreclosure complaints in Bergen and Ocean Counties where the properties are located. Plaintiffs were not successful in their efforts to refinance or market these properties as there were several other judgments recorded against the properties. The original lender transferred the notes and assigned the mortgages while the foreclosure actions progressed.

In 2014, Steven Batitsas (plaintiff) was introduced to Mendy Pollack through a mutual friend who was a real estate agent. Plaintiff testified that Pollack told him he had a proposal where "you'll make some money and I'll make some money." The proposal was that Park Point Investors, LLC (defendant) would be formed and it was "going to buy [the property] back from the banks . . . and [plaintiff] would owe them 1.4 [million]." Pollack advised that plaintiff "could sell the properties or keep the properties, so long as we get [$]1.4 [million], doesn't matter where you got it from."

Pollack denied telling plaintiff he could retain the properties. He testified "[t]he restrictions were that the properties needed to be sold to a bona fide third party, and any excess above $1.4 million would be [plaintiffs'] . . . . [Plaintiffs] were not allowed to retain the properties or refinance or anything like that." Rather, the properties were to be sold in twelve months because defendant had investors who wanted their money back. The properties were to be sold to someone other than plaintiffs so that the junior lienholders did not accuse defendant of collusion.

Pollack testified that defendant was "a single purpose entity[]" formed for the purpose of acquiring these properties and selling them. He testified this "was

the first type of deal we did in this nature." It was "very unique" because it was made through a mutual friend.

The parties entered into a Forbearance and Settlement Agreement (Forbearance Agreement) on September 3, 2014. Under the Forbearance Agreement, defendant agreed to "forebear from proceeding with the commencement of a commercial collection action against [plaintiffs] in the Superior Court of New Jersey, Law Division (the 'Forbearance Period')." During this period, defendant would foreclose on the properties "on an uncontested basis." The agreement contemplated that defendant would gain title to the properties and the deeds through a sheriff's sale. Plaintiffs agreed to sign individual guaranties. They also agreed to provide defendant with a first mortgage in the amount of $300,000 on a property they owned in Florida.

Under the Forbearance Agreement, plaintiffs agreed to pay defendant $9500 per month as a "monthly interest payment," which was to be applied by defendant to the interest accrued on the loans, but not to the principal amount. Plaintiffs could retain "any additional income or rents generated by the [p]roperties in excess of $9,500 per month after covering taxes, insurance, maintenance and repairs to the [p]roperties and other carrying costs."

The parties agreed that plaintiffs could manage the properties. Once defendant obtained title "through the delivery and recording of [s]heriff's [d]eeds for the [p]roperties," plaintiffs had the option to have a separate management agreement with defendant. Relevant here, the Forbearance Agreement provided:

> [u]nder the proposed [m]anagement [a]greement, [plaintiffs], as managers of the [p]roperties, would have a period of twelve (12) months from the date of the sheriff sale in which [defendant] acquires title to the [p]roperties (the "[m]anagement [p]eriod"), to list, market and close on the sale of both [p]roperties in an amount that generates [t]otal [n]et [s]ale [p]roceeds (as defined herein) of $1,400,000 payable to [defendant].

Defendant also agreed that if the total amount from the sales exceeded $1,400,000 "that any excess sale proceeds above $1,400,000 shall be paid to and belong solely to the [plaintiffs]." Defendant could approve or reject the plaintiffs' proposed listing prices. If plaintiffs did not close on the properties and pay defendant $1.4 million, "by the end of the [m]anagement [p]eriod, the [m]anagement [a]greement shall automatically terminate and [defendant] shall have no further obligations to the [plaintiffs] . . . ." Plaintiffs would no longer manage the properties "and shall no longer be entitled to any proceeds of the sale of the [p]roperties."

A-1813-18T1

The parties never entered into a written management agreement although it was not disputed that they managed the properties based on an oral agreement. Pollack testified that under the oral agreement, plaintiffs were to collect the rents and sell the properties in twelve months.

Defendant acquired the note and mortgage for the Point Pleasant property in October 2014 and for the Palisades property in November 2014. Defendant foreclosed on the Palisades property on January 30, 2015, and obtained the sheriff's deed on February 9, 2015, which was recorded on March 10, 2015. Defendant foreclosed on the Point Pleasant property on March 24, 2015, and obtained the sheriff's deed on April 6, 2015, which was recorded on May 11, 2015. The record does not disclose the amount defendant paid to acquire the mortgages.

The Point Pleasant property was sold within five months, closing on October 15, 2015, and netting $1,179,000 for defendant. This left an amount due to defendant under the Forbearance Agreement of $221,000, which was the difference between the net proceeds from this sale and $1.4 million.

The Palisades property was listed by plaintiffs for $1.2 million but did not sell during 2015. Pollack testified that he discussed with plaintiff that the deadline to sell the Palisades property was January 30, 2016. On January 19,

2016, defendant's attorney advised plaintiffs that their option to sell the Palisades property would expire on January 30, 2016 because "[t]he [twelve] month management period began to run from the date of the [s]heriff's [s]ale of the Palisades Park property on January 30, 2015 . . . ." Counsel advised that after January 30, 2015, it would "be entitled to assume full management of the Palisades Park property and keep all of the rental proceeds with no distribution to you."

Counsel for plaintiffs responded on January 25, 2016, that his "client is aware that his rights under the Forbearance . . . Agreement expire on [January 30, 2016]." He asked that plaintiffs have a twenty-five-day extension of the deadline because the sale of their bagel business would close on February 16, 2016, and it could then "pay off the balance due to Park Point." Plaintiffs suggested that a friend might have the money to buy the property. Pollack testified that he denied making any offer to plaintiffs to extend the January 30, 2016 deadline because of the other investors.

Defendant terminated the Forbearance Agreement on February 3, 2016 and requested information about the tenants in order to take over management of the property. On April 7, 2016, counsel for plaintiffs advised that they were in a position to redeem the properties. As an alternative, they offered to "turn

over" another property "in exchange for" a release of the Palisades property. Counsel argued the Forbearance Agreement did not expire until May 11, 2015, because that was when the sheriff's deed for the Point Pleasant property was recorded. He told defendant that plaintiffs wanted a credit because the $9500 per month payment should have been reduced after the Point Pleasant property was sold. Counsel for defendant disputed the deadline and demanded plaintiffs turn over any security deposit from the tenant at the Palisades property.

Defendant sold the Palisades property in July 2016 for $700,000, netting $660,626.26. Therefore, defendant was paid $1,839,626.26 for the two properties ($1,179,000 plus $660,626.26), which was $439,626.26 more than the $1.4 million set forth in the Forbearance Agreement.

In September 2016, plaintiffs filed an order to show cause and verified complaint against defendant. As subsequently amended, the first count alleged a breach of the Forbearance Agreement by its early termination. Count Two asked to compel an accounting for the proceeds from the sale of the Point Pleasant property and the monthly payments of $9500. Count Three characterized the Forbearance Agreement as an equitable mortgage and alleged that defendant deprived plaintiffs of their right to redemption. Count Four requested a release of the security provided by their Florida property.

A-1813-18T1

Defendant's Answer included a three-count counterclaim seeking a declaratory judgment that plaintiffs violated the Security Deposit Act, N.J.S.A. 46:8-19 to -26 (Count One); a judgment ordering plaintiffs to turn over the security deposit (Count Two); and a judgment that plaintiffs were liable for conversion (Count Three).

A bench trial was conducted. The trial court entered a judgment on November 15, 2018 in favor of plaintiffs against defendant for $439,626 plus interest but deducted the amount of the security deposit that was disputed.

In its written decision, the trial court found "incredulous" the claim that other creditors might claim collusion if plaintiffs could purchase the Palisades property because no one disputed that the junior lien holders had been paid by the sale of plaintiffs' bagel business. The trial court concluded the transaction between the parties was a joint venture. The court found that the payment of $1.4 million and the monthly interest payments "was the objective of [d]efendant[] as its share of joining with [p]laintiffs."

The trial court found defendant violated its duty of loyalty to plaintiffs. "Defendant's actions were clearly intended to allow the joint venture to fail so that [d]efendant could then take the full profits of the sale of the properties and leave [p]laintiff[s] with nothing." Pollack acknowledged he did not advise

plaintiffs to lower the asking price for the Palisades property. This was not in the best interest of the joint venture. Defendant would not accept payment of $220,000 from plaintiffs. The court rejected defendant's argument about its investors, finding it to be "pretextual." Had defendant accepted a payment from plaintiffs, the building still could have been sold by plaintiffs at arms-length to a third party, the investors would have been paid on time and plaintiffs could have achieved their "expected benefit" of selling the property and keeping the profits. The court found defendant would not have been prejudiced by an extension.

The trial court also found that defendant breached the implied covenant of good faith and fair dealing implied in every contract. The intent of the parties was for defendant to receive $1.4 million upon the sale of the properties and for plaintiffs to obtain clear title and additional profits, if any. By refusing plaintiffs' suggestions to carry out the intent of the contract, defendant violated the duty of good faith and fair dealing.

The court found plaintiffs substantially performed under the contract. Defendant received a significant portion of the $1.4 million, had other collateral and was being paid interest. Defendant could have lowered the offering price

for a quicker sale. There would have been little or no risk if defendant permitted an extension of time.

The court found defendant never proved that plaintiffs were paid an additional $60,000 on the Palisades property. The court addressed the security deposit claim by ordering its deduction from the judgment awarded to plaintiffs.

The trial court found an ambiguity in the Forbearance Agreement regarding commencement of the twelve month time frame, which it then construed against defendant as the drafter, finding the "[one] year time period should [not] have run until April 6, 2016 or at least March 24, 2016" and that defendant prematurely terminated the contract. The language was at best confusing entitling plaintiffs to additional time.

On appeal, defendant argues that the trial court erred by finding defendant breached the implied covenant of good faith and fair dealing because it failed to find defendant had a bad faith motive and the trial court improperly added other terms to the Forbearance Agreement. Defendant argues that the court erred by finding there was a joint venture or fiduciary relationship between the parties.

## II.

We afford a deferential standard of review to the factual findings of the trial court on appeal from a bench trial. Rova Farms Resort, Inc. v. Inv'rs Ins.

Co., 65 N.J. 474, 483-84 (1974). These findings will not be disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. at 484 (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). We discern no basis based on our review of the record to disturb the court's fact finding.

Our review of a trial court's legal determinations is plenary. D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We review de novo whether the facts satisfy the applicable legal standard for a joint venture.

"[A] joint adventure is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." Wittner v. Metzger, 72 N.J. Super. 438, 444 (App. Div. 1962) (quoting Kurth v. Maier, 133 N.J. Eq. 388, 391 (E. & A. 1943)). It generally "refers to a particular kind of partnership—one for a limited purpose or for a limited duration . . . ." Fliegel v. Sheeran, 272 N.J. Super. 519, 524 (App. Div. 1994). "[A] common element is a fiduciary relationship." Wittner, 72 N.J. Super. at 444. Whether a joint venture is created "depends upon [the parties'] intention in accordance with the ordinary rules governing the interpretation and construction

12

of contracts." Id. at 445 (citing 2 Williston on Contracts § 318A (3d. ed. 1959)). It is "the voluntary agreement of the parties to form a relationship with the intent to create a joint venture." Sullivan v. Jefferson, Jefferson & Vaida, 167 N.J. Super. 282, 290 (App. Div. 1979).

A joint venture includes "some or all" of these elements: 1) a contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking; 2) a joint property interest in the subject matter of the venture; 3) a right of mutual control or management of the enterprise; 4) an expectation of profit; 5) the right to participate in profits; and 6) limitation of the objective to a single undertaking. Wittner, 72 N.J. Super at 444 (citing Williston, § 318A, at pp. 563-565).

The record shows that the elements of a joint venture were present. The contract contemplated a contribution from both parties. Defendant paid to purchase the defaulted mortgages. Plaintiffs posted additional security by mortgaging its property in Florida and signing personal guarantees. They also agreed not to contest the foreclosure action once defendant purchased the defaulted mortgages, allowing their property to be foreclosed. Then, as the undertaking unfolded, defendant gained ownership of the commercial properties, but plaintiffs managed them and collected rents, keeping what

exceeded $9500 per month. "A joint adventurer may entrust actual control of the operation to his coadventurer and it still remains a joint venture." Wittner, 72 N.J. Super. at 446.

Plaintiffs' understanding was that they would retain the net proceeds from the sales which exceeded $1.4 million. Both parties had control over aspects of the venture. Defendant could have adjusted the sale price had it chosen to do so. Plaintiffs managed the properties that defendant owned.

There was an expectation of profits for both parties. Plaintiff testified that Pollack proposed this as a venture where "you'll make some money and I'll make some money." Defendant purchased the defaulted mortgages with the expectation of a profit if the $1.4 million was paid. Plaintiffs had an expectation of profit if the properties sold for more than $1.4 million. Both parties stood to lose if the properties could not be sold for substantial amounts. The venture was a single undertaking. Defendant was formed for the sole purpose of this undertaking.

Parties in a joint venture owe each other a fiduciary duty. Silverstein v. Last, 156 N.J. Super. 145, 152 (App. Div. 1978). They are liable for the harm stemming from a breach of that duty. F.G. v. MacDonell, 150 N.J. 550, 564 (1997).

We agree with the trial court that defendant breached this duty. The goal of paying defendant $1.4 million was nearly reached once plaintiffs sold the Point Pleasant property. Plaintiffs offered defendant various alternatives to pay the remaining $221,000. Plaintiffs also asked for an extension of time on the deadline. Defendant rejected this, terminating the contract at its earliest possible date. Although defendant claimed this was based on the need to repay its investors, the trial court's analysis—we think correct—concluded that the investors could have been satisfied. This would not have precluded a third-party sale or payment of the investors while preserving plaintiffs' ability to benefit from the sale. The record supported that defendant chose to protect its interests and those of its investors to the detriment of plaintiffs. Therefore, the breach of duty was established.

Every contract includes the implied covenant of good faith and fair dealing. Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001) (citing Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997)). A party breaches this covenant when it "exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." Id. at 251. "Bad motive or intention is essential . . . ." Ibid.

Defendant argues the trial court did not find defendant had a bad faith motive. However, the trial court found defendant never lowered the asking price for the Palisades property even though it had information the asking price was too high. It did not consider an extension of time for plaintiffs. In fact, defendant chose to terminate the contract on the earlier date—January 30—arguing that was when the twelve months commenced, even though the language of the contract was ambiguous and could have allowed for later commencement dates. These findings by the trial court were supported by the record and satisfied the requirement of bad faith necessary for a finding that the duty of good faith and fair dealing was violated.

After carefully reviewing the record and the applicable legal principles, we conclude that defendant's further arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1813-18T1