**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3523-23
               A-0581-24

WARREN DIAMOND, individually
and derivatively on behalf of
147 BROAD ST., LLC,

     Plaintiff-Respondent,

v.

SCOTT DIAMOND,

     Defendant-Appellant.

_____

WARREN DIAMOND, individually
and derivatively on behalf of
147 BROAD ST., LLC,

     Plaintiff-Respondent,

v.

SCOTT DIAMOND,

     Defendant-Respondent.

_____

147 BROAD ST., LLC,

Intervenor-Appellant.
_____

Argued January 15, 2026 – Decided March 31, 2026

Before Judges Gilson, Firko, and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3090-18.

Marc J. Gross argued the cause for Scott Diamond, appellant in A-3523-23 and respondent in A-0581-24 (Fox Rothschild LLP, attorneys; Marc J. Gross, of counsel and on the briefs; Jordan B. Kaplan, on the briefs).

Darren C. Barreiro argued the cause for appellant 147 Broad St., LLC (Greenbaum, Rowe, Smith & Davis, LLP, attorneys; Darren C. Barreiro and Joseph A. Natale, of counsel and on the briefs).

Timothy C. Moriarty argued the cause for respondent Warren Diamond (Charles Moriarty, LLC, attorneys; Timothy C. Moriarty, of counsel and on the briefs; Matthew K. Blaine, on the briefs).

PER CURIAM

These two appeals arise out of disputes between a father, Warren Diamond (Warren), and his son, Scott Diamond (Scott), over the ownership and operation of an investment property located at 147 Broad Street, Red Bank, New Jersey

(the Property).[1]  The Property was purchased and owned by a limited liability corporation, 147 Broad St., LLC (147 Broad).  Warren, on behalf of himself individually and claiming to be a representative of 147 Broad, sued Scott alleging that Scott had mismanaged the Property, engaged in self-dealing, and damaged Warren.  Following a ten-day bench trial, the trial court entered a final judgment, finding that Scott had converted monies belonging to Warren and had unjustly enriched himself by misappropriating funds and mismanaging the Property at Warren's expense.  The court also found Warren and Scott had entered a joint venture to acquire and operate the Property.  As a remedy, the trial court ordered the Property to be sold and the sale proceeds to be distributed with fifty percent going to Scott, forty-nine percent going to Warren, and one percent going to Melissa Diamond, who is Warren's daughter and Scott's sister.

Scott appeals from the final judgment, which was entered on June 30, 2024.  He argues the trial court had no right to compel the sale of the Property and that the court's findings of conversion, unjust enrichment, and a joint venture were unsupported by the evidence presented at trial.

---

[1]  To avoid confusion, we use first names because Warren and Scott share a common surname.  In doing so, we mean no disrespect.

A-3523-23

147 Broad intervened after the trial and filed a separate appeal from the final judgment. 147 Broad primarily argues that its due process rights were violated because the trial court's remedy of compelling the sale of the Property, which the corporation owns, was granted when 147 Broad was not a party to the action.

We issue this consolidated opinion to address all challenges raised by Scott and 147 Broad. Having reviewed the record and law, we affirm the trial court's findings that Scott converted Warren's monies and unjustly enriched himself, thereby causing damage to Warren. We also affirm the trial court's finding that Warren and Scott had entered a joint venture to purchase and operate the Property.

We vacate the remedy compelling a sale of the Property, and remand for a limited hearing on the remedies that can be accorded to Warren. In so doing, we hold that both law and equity allow the court to compel the sale of the Property provided that 147 Broad is afforded an opportunity to be heard. Accordingly, on remand, 147 Broad will be a party and will have the right to address whether one of the remedies should be compelling the sale of the Property and the distribution of the sale proceeds.

A-3523-23

I.

We summarize the facts from the record, primarily relying on the evidence presented at trial. The main issues at trial were determining Warren's interest in the Property, determining whether Scott had misappropriated monies Warren had lent to purchase, develop, and maintain the Property, and determining whether Scott had mismanaged the Property to unjustly enrich himself at Warren's expense.

The Property is a two-story building with space for a commercial tenant on the first floor and a garden apartment on the second floor. In 2010, Warren became interested in purchasing the Property. In 2013, Warren negotiated and agreed to a contract to purchase the Property from its then owner, All the Flowers, Inc., for $1.375 million. To facilitate the purchase, Warren paid the initial deposit of $20,000 and arranged an acquisition loan of $1,204,000 from Amboy Bank.

As Warren was arranging the purchase, he had discussions with Scott regarding management of the Property and Scott living in the second-floor apartment. On December 18, 2013, Scott drafted and sent to Warren a memorandum of understanding (the 2013 MOU) regarding the operation of the Property. The 2013 MOU stated, among other things:

- Warren "will assign the contract to 147 Broad St. LLC. This LLC is 99% owned by [Scott] and 1% by Melissa Diamond. [Scott is] the sole manager of this LLC. [Warren] will be [Scott's] named successor."

- "When and if [Scott] move[s] out of the sole apartment [Scott] will convey, at [Warren's] option, a 49% interest in the building."

Warren never signed or agreed in writing to the 2013 MOU.

Before sending the 2013 MOU, Scott formed 147 Broad in September 2013, as a New Jersey limited liability company. Approximately two months later, in November 2013, Scott and Melissa signed an Amended and Restated Operating Agreement for 147 Broad (the Operating Agreement). The Operating Agreement stated that Scott and Melissa were the two members of 147 Broad, with Scott owning ninety-nine percent and Melissa owning one percent. Paragraph 11(a) of the Operating Agreement stated 147 Broad "shall be dissolved upon . . . (iv) the sale of the Property and all or substantially all of the assets of the Company and the collection and distribution of the proceeds of such sale."

In January 2014, Warren assigned the contract for the purchase of the Property to 147 Broad. That same month, 147 Broad purchased the Property using the loan from Amboy Bank. At the closing, Warren lent 147 Broad $280,000 and paid an additional $100,00 for furniture. Warren also signed a

6

guaranty, which guaranteed the repayment of the acquisition loan from Amboy Bank and the related mortgage.

Following the purchase of the Property, Warren continued to be involved in developing the Property and invested more monies in the Property. In that regard, Scott stipulated that Warren invested at least $440,000 into the Property and 147 Broad.

On June 3, 2014, Warren and Scott signed a document entitled, "Consents, Acknowledgments[,] and Agreements" (the June 2014 Agreement). The June 2014 Agreement addressed various properties and entities Scott and Warren had interests in and resolved certain disputes. Relevant to the Property and 147 Broad, the June 2014 agreement stated:

> Warren acknowledges approximately $200,000 in loans from Scott to Warren in June and July of 2013. Scott acknowledges Warren has invested $380,000 into 147 Broad Street LLC. They both have invested time, knowledge and expertise. In consideration thereof, the parties agree[] that when Scott no longer lives at 147 Broad St., Red Bank, [New Jersey], [] Scott will transfer to Warren 49% of the membership interest in 147 Broad Street LLC. The books and records of 147 Broad Street LLC will be maintained to indicate loans from Warren are credited [one half] to Warren's loan account and [one half] to Scott's loan account. Warren acknowledges and reaffirms that he is the guarantor of a loan taken with Amboy [B]ank in connection with the January 2014 closing of 147 Broad Street, Red Bank, NJ by 147 Broad Street LLC. In any event[,] whenever

A-3523-23

> distributions are made[,] they shall be made 1% to Melissa Diamond, 49% to Warren and 50% to Scott.

Consequently, under the June 2014 Agreement, Warren was to (1) have a loan account with 147 Broad; (2) receive forty-nine percent of all distributions made by 147 Broad; and (3) receive a forty-nine percent membership interest in 147 Broad "when Scott no longer live[d] at" the Property.

When 147 Broad closed on the purchase of the Property, it submitted to Amboy Bank a lease agreement between 147 Broad and Scott. The lease provided Scott would occupy the second-floor apartment and pay $3,200 per month in rent, all utilities he used, and a $4,800 security deposit. Scott's rental payments, together with the rental payments from other tenants of the Property, were to be used to repay the loan and mortgage.

Following the acquisition of the Property, Red Bank Design Center became the Property's first-floor commercial tenant. Between 2015 and 2024, Red Bank Design Center paid approximately $1.2 million in rent, its utilities, and fifty-seven percent of the maintenance costs for the common area of the Property.

In and after 2015, Warren expected 147 Broad to make distributions and repay his loans. At some point, he received a $50,000 distribution, but no other distributions or payments were made to him.

In August 2018, Warren sued Scott. He asserted individual claims and derivative claims on behalf of 147 Broad. Counts one through five of Warren's complaint were derivative claims asserted on behalf of 147 Broad and sought relief under the Revised Uniform Limited Liability Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94. Specifically, in the counts asserting claims under RULLCA, Warren sought (1) access to 147 Broad's books and records; (2) removal of Scott as a managing member and sale of his interest in 147 Broad; (3) a declaration that Scott had oppressed the interest of other members and mismanaged 147 Broad; (4) a ruling Scott had breached his fiduciary duties; and (5) a ruling Scott had breached an implied duty of good faith and fair dealing.

In count six, Warren asserted a claim for conversion, alleging Scott had converted funds and other assets for his personal benefit. In count seven, Warren asserted a claim for unjust enrichment, alleging Scott "has conferred benefits upon himself that are not deserved and has otherwise unjustly benefited himself at the expense of [147 Broad] and Warren Diamond." As relief, Warren requested a judgment awarding (1) "compensatory and consequential damages;" (2) "attorney[]s' fees, interest, and costs of suit;" and (3) "[a]ll other relief that the [c]ourt deems equitable and just."

9

After almost six years of discovery and pretrial proceedings, the matter proceeded to a bench trial in 2024.  Over ten days in January and March 2024, the court heard extensive testimony from Warren and Scott, who were the only witnesses.  The court also reviewed and considered numerous exhibits that were entered into evidence.

At trial, Warren asserted Scott had misappropriated monies and funds that should have allowed 147 Broad to make distributions.  In support of that claim, Warren introduced evidence showing Scott had set up management agreements under which 147 Broad paid ten percent of the Property's gross revenues to separate entities that were owned and controlled by Scott.  Between 2014 and 2024, Scott's separate companies billed 147 Broad for over $162,800 in management fees.  The management agreements that Scott made with the entities he controlled also entitled those entities to ten percent of any proceeds of a refinancing or sale of the Property in excess of the existing mortgage debt.

Warren also introduced evidence that Scott had not paid $3,200 in monthly rent.  Instead, he alleged Scott had paid himself ten percent interest on his loans to 147 Broad and used that interest to pay rent of $2,500 per month. In response, Scott argued that there was an agreement that he would pay $2,500 a month in rent.  Scott, however, could not produce a written lease reflecting

that rent agreement. Instead, Scott testified that he thought a monthly rent of $2,500 was "fair" and reflected the fair market value. Scott acknowledged that he paid the rent out of an "interest account" at 147 Broad.

During trial, there was also a dispute concerning the accuracy of the books and records Scott maintained for 147 Broad. Despite prior discovery demands, Scott first produced QuickBooks accounts during trial, which he represented were for 147 Broad. Warren moved for sanctions, which the trial court granted.

Moreover, at trial, Scott could not explain many of the entries on the QuickBooks accounts. In particular, he had difficulty explaining the amount of loans he made to 147 Broad. For example, at one point Scott claimed he had $870,000 in his loan account. Thereafter, Scott claimed that he had contributed $602,114.23 to 147 Broad. Scott could not support either of those alleged amounts with any documentary evidence other than his own entries to the QuickBooks account.

Following the close of evidence, the parties submitted proposed findings of facts. On June 30, 2024, the trial court entered a final judgment. The court supplemented the final judgment with a written statement of reasons setting forth its findings of facts and conclusions of law.

The trial court began its factual findings by assessing the credibility of Warren and Scott. The court found neither of them to be credible. In that regard, the court stated:

> Plaintiff and [d]efendant testified. The dysfunctional relationship between the parties was the underlying tone of both parties' testimony. While they each professed their love for each other, it was clear to the [c]ourt that they disliked each other and would go out of their way to prevent the other from profiting on the property. The [c]ourt did not find either of the Diamonds to have credibly testified, each choosing to reveal as little as possible to the [c]ourt to advance their own interests.

The court then considered Warren's derivative claims asserted on behalf of 147 Broad. The court found that Warren was not a member of 147 Broad and, therefore, he had no standing to seek relief on behalf of the limited liability corporation. Accordingly, the court dismissed counts one through five of Warren's complaint with prejudice. No party, including Warren, has appealed from that portion of the judgment.

Addressing counts six and seven, the court found that Scott had converted monies belonging to Warren and had unjustly enriched himself by misappropriating monies at the expense of Warren and 147 Broad. In that regard, the court found:

(1)    Scott has engaged in a decade-long continuous and unexplainable misappropriation of funds [] which served his own benefit and [were at] the expense of Warren and his investment-backed expectations associated with 147 Broad;

(2)    [Scott] utilized interest accrued upon the loans taken from Warren and other miscellaneous company loans to fund expenses that ultimately end[ed] up benefiting [Scott], including the payment of rent;

(3)    Scott converted one-half of Warren's $280,000 January 16, 2014, investment and allocated it to himself as a loan in the amount of $140,000.  Thereafter, Scott would take [ten percent] annual interest on that loan amount which yields the figure of $14,000 per year. Multiplied over the course of the ten years [during] which Scott resided []in the second-floor apartment provides for $140,000 in interest which was utilized to pay rent owed through his book account deduction and foregoing any money actually being paid to 147 Broad;

(4)    Through this process Scott was able to convert Warren's $280,000 January 16, 2014, loan into a benefit of $280,000 for himself and a loss of $140,000 for Warren;

(5)    [T]he evidence presented demonstrates an intentional and deliberate undervaluing of rent carried out by Scott in order to obtain a benefit on behalf of himself and at the expense of Warren;

(6)    Scott, by way of manipulation of books and loan accounts, has converted funds provided by Warren and has utilized them in a manner which directly impedes the possibility of financial gain by Warren.

The court also found Warren and Scott had a joint venture in the Property. In making that determination, the court found the joint venture was based on Warren having identified the Property, contracted for its purchase, made the initial deposit, and arranged the acquisition loan. The trial court relied on the June 2014 Agreement as reflecting the joint venture arrangement between Warren and Scott. Based on a plain reading of the June 2014 Agreement, the court found the "loans made by Warren to [147 Broad] were rendered in consideration for a future 49% interest should Scott no longer reside in the apartment."

The court also relied on Warren's agreement to pay any "shortfall in the rent amount" owed to Amboy Bank. The court also noted that Warren had paid a delinquent mortgage payment on the property in February 2014. Moreover, the court found Warren "continued to be involved [with] and invest his own money [in] 147 Broad," despite not being a member of 147 Broad.

Additionally, the trial court made findings concerning the loan accounts Warren and Scott had with 147 Broad. Regarding Warren's loan account, the court determined that it had a value of $189,269.69. In making that finding, the court noted that Warren had only received one distribution in the amount of $50,000.

14

As to Scott's account, the court found that the loan account had a value of $226,769.69. In making that finding, the trial court expressly rejected Scott's claims his loan account was either $872,000 or just over $602,000. Instead, the trial court expressly found: "While Scott asserts a much higher loan account balance, the [c]ourt does not find that to be true."

After making all those findings, the trial court addressed the remedy for Scott's conversions, misappropriations, and unjust enrichment. The court reasoned that because Scott has misappropriated funds and manipulated the books and records of 147 Broad, the appropriate remedy would be to compel the sale of the Property. Specifically, the court found that "Scott has engaged in ten-years' worth of abuse of power as a 99% interest-holder [of 147 Broad] and sole manager of the Property." Consequently, the court determined that it was equitable to compel the sale of the Property and distributions of the proceeds to Scott, Warren, and Melissa. The court directed that Scott's and Warren's loan accounts would first be paid and then the net sale proceeds would be divided, with forty-nine percent to Warren, fifty percent to Scott, and one percent to Melissa.

The court memorialized its rulings in the final judgment entered on June 30, 2024. That same day, the court also entered an order, supported by a

15

statement of reasons, requiring Scott to pay Warren $9,353.50 in attorneys' fees and costs as a sanction for failing to timely produce the QuickBooks accounts.

Two weeks after the final judgment was entered, Scott filed a notice of appeal. The following week, on July 24, 2024, 147 Broad moved to intervene for the purpose of filing an appeal and to stay the sale of the Property pending the appeal. The trial court granted the intervention motion and stayed the action. Accordingly, we have appeals from Scott and 147 Broad.[2]

II.

In his appeal, Scott makes four main arguments. He contends the trial court erred by (1) rewriting the June 2014 Agreement to give Warren the right to his forty-nine percent interest while Scott was still living in the apartment; (2) making factual findings that were not supported by the evidence; (3) granting Warren relief based on his claims of conversion and unjust enrichment; and (4)

---

[2] 147 Broad should have moved before us for the right to file an appeal. To preserve judicial economy, we will hear the appeal and treat the matter as if 147 had moved before us and we had granted leave to file an appeal. See Caggiano v. Fontoura, 354 N.J. Super. 111, 124 (App. Div. 2002) (noting this court may grant leave "in the public interest . . . where the appellant filed a notice of appeal rather than a required motion for leave"); see also N.J. Dep't of Env't. Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 296 (App. Div. 2018) (explaining that non-parties may intervene in an appeal from a judgment adverse to their interests).

A-3523-23

compelling the sale of the Property without hearing from 147 Broad, which denied the LLC its due process.

On its appeal, 147 Broad focuses on the trial court's remedy, which compelled the sale of the Property. It contends that it owns the Property, and because it was not a party to the action, its, as well as Melissa's, due process rights were violated when the trial court compelled the sale of the Property without providing notice and having an opportunity to be heard. In connection with that argument, 147 Broad asserts RULLCA prohibits compelling the sale of the Property to satisfy Warren's judgment against Scott. Additionally, 147 Broad contends that Warren never requested the sale of the Property and, therefore, the trial court erred by compelling the sale.

III.

We begin by reviewing the trial court's factual findings and legal conclusions. An appellate court's review of the factual findings made by the trial court after a bench trial is limited and deferential. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We will not interfere with factual findings unless those findings are not supported by substantial credible evidence in the record. Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 329 (2017). In contrast, we review de novo a trial court's legal conclusion and its application

of established facts to the law. Sipko v. Koger, Inc., 251 N.J. 162, 179-80 (2022).

The trial court made three legal conclusions based on its factual findings. First, it concluded Scott had converted monies Warren had lent to 147 Broad. Second, it determined Scott had unjustly enriched himself by misappropriating funds and operating 147 Broad in a way that benefited himself to the detriment of Warren and 147 Broad. Third, the court held Warren and Scott had a joint venture in the Property.

A.    Conversion.

Conversion is the intentional exercise of control over property that interferes with the right of another to control that property and thereby damages the other person or entity. See Meisels v. Fox Rothchild LLP, 240 N.J. 286, 304 (2020) (quoting Chi. Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 454 (App. Div. 2009)) (stating that "[c]onversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel"). To prove a conversion, a claimant must show that (a) he or she owns property or an interest in property, and (b) the defendant has wrongfully taken that property or interfered with the claimant's interest in the property. See

First Nat'l Bank of Bloomingdale v. N. Jersey Tr. Co., 18 N.J. Misc. 449, 452 (1940).

In finding that Scott had converted monies belonging to Warren, the trial court made a series of factual findings. Specifically, the trial court found that Scott took unauthorized control over Warren's investments in 147 Broad. For example, the trial court found Scott took control over half of Warren's $280,000 investment and without proper authorization gave himself ten percent annual interest, which over ten years converted $140,000 to Scott that properly belonged to Warren. Those factual findings are amply supported by the evidence in the record.

Moreover, those factual findings support the legal conclusion that Scott engaged in conversion. Scott took control of and misused Warren's money "in a way that would deprive [] [Warren] of its benefit." Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 431 (App. Div. 2011) (quoting Cargill Glob. Trading v. Applied Dev. Co., 706 F. Supp. 2d 563, 578 (D.N.J. 2010)).

Consequently, we affirm the trial court's findings that Scott engaged in conversion and that the conversion caused damage to Warren.

A-3523-23

B.    Unjust Enrichment.

To prove an unjust enrichment claim, plaintiff must demonstrate that defendant "received a benefit and that retention of that benefit without payment would be unjust." Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007)). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of the remuneration enriched defendant beyond [his or her] contractual rights.'" Ibid. (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)).

In finding Scott had unjustly enriched himself, the trial court determined that Scott had substantially underpaid his rent and inappropriately paid himself management fees. The court found Scott should have been paying rent at the rate of $3,200 per month. Instead, Scott accounted for rent payments of $2,500 per month but never made those payments. Rather, the payments were made from interest Scott gave to himself on his loan account.

Additionally, the trial court found Warren had a reasonable expectation that he would receive forty-nine percent of the distributions from 147 Broad, but Scott's misappropriations prevented all but one distribution from being made.

20

Therefore, Warren never received distributions except for one distribution of $50,000. All those factual findings are supported by substantial credible evidence.

Scott takes issue with the trial court's findings regarding the rent payments. He contends there was an understanding that he would pay $2,500 per month. The court expressly rejected that argument, finding there was no written lease supporting Scott's position. Moreover, the court found that the only written lease in the record called for Scott to make payments of $3,200 per month. The court's rejection of Scott's position is supported by credible evidence and is also based on the court's determination that Scott lacked credibility.

Like its finding of conversion, the trial court's finding of unjust enrichment is also supported by the law. See Thieme, 227 N.J. at 290 (finding unjust enrichment where plaintiff relied on the expectation of proceeds from the sale of a company).

C.    The Joint Venture.

"[A] joint venture is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses." Ernest Bock & Sons-Dobco Pennsauken Joint Venture v. Township of

Pennsauken, 477 N.J. Super. 254, 266 (App. Div. 2023) (alteration in original) (quoting Wittner v. Metzger, 72 N.J. Super. 438, 444 (App. Div. 1962)). "A joint venture is simply a single-purpose partnership, [where] an entity [is] formed for a limited duration." Ibid. (quoting Fliegel v. Sheeran, 272 N.J. Super. 519, 524 (App. Div. 1994)). A joint venture need not be created by law; rather, it can be expressly or impliedly assumed by the parties. Wittner, 72 N.J. Super. at 443.

Generally,

> [a] joint venture includes 'some or all' of [the following] elements: (1) a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; (2) a joint property interest in the subject matter of the venture; (3) a right of mutual control or management of the enterprise; (4) an expectation of profit; (5) the right to participate in profits; and (6) limitation of the objective to a single undertaking.
>
> [Ernest Bock, 477 N.J. Super at 266 (quoting Wittner, 72 N.J. Super. at 444).]

In determining that Warren and Scott had entered a joint venture to purchase and operate the Property, the court made a series of factual findings. Those findings included that (1) Warren discovered the Property; (2) Warren negotiated the agreement to purchase the Property and paid the initial deposit; (3) Warren arranged the loan and mortgage to acquire the Property and

22

guaranteed the loan and mortgage; (4) Warren contributed monies to the Property, including at least $440,000; (5) Warren devoted time and effort to the development of the Property; and (6) Warren had a reasonable expectation he would receive profits from the Property, including ultimately a forty-nine percent interest in the Property.

Those findings are all supported by substantial credible evidence in the record. Those findings also support the legal conclusion that Warren had a joint venture with Scott in the Property.

Scott takes issue with the trial court's determination that Warren was entitled to his forty-nine percent interest in the Property at this time. Scott contends that under the June 2014 Agreement, Warren's forty-nine percent interest was contingent on Scott moving out of the apartment. So, Scott asserts that because he had not moved out, the court had no right to rewrite the contract.

We reject Scott's argument. Having found that Scott converted Warren's monies and having found that Scott misappropriated monies and mismanaged the operations of 147 Broad to benefit himself at the expense of Warren, the court properly concluded that Warren had a right to his forty-nine percent interest in the Property as a remedy for those breaches. In other words, the trial court found Scott first breached the June 2014 Agreement by improperly

23

operating the Property and, therefore, the appropriate remedy was to award Warren his forty-nine percent interest in the Property.

D.    The Remedy Ordered.

Having found Scott liable under three different legal claims, the trial court determined that the appropriate remedy was to compel the sale of the Property. In that regard, the court directed that the Property be sold, Scott and Warren be repaid their loans, and the net sale proceeds be distributed with fifty percent to Scott, forty-nine percent to Warren, and one percent to Melissa.

147 Broad contends the trial court erred by granting that relief without hearing from it. It specifically asserts that it has a due process right to be given notice and an opportunity for a hearing before its property is sold.

Initially, we note this argument is based on the legal fiction of a corporation's "personhood." See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 465 (2010) (Stevens, J., concurring in part, dissenting in part) (explaining that corporate "'personhood' often serves as a useful legal fiction. But [corporations] are not themselves members of 'We the People' by whom and for whom our Constitution was established"). Scott controlled 147 Broad. He was clearly on notice of Warren's action and defended it vigorously since 2018. Thus, Scott always had the ability to have 147 Broad intervene in the action.

24

Warren believed that 147 Broad was part of the action because he had filed claims derivatively on behalf of 147 Broad. It was only when the trial court made its rulings in 2024, that Warren learned he could not assert an action on behalf of 147 Broad.

Nevertheless, we vacate the remedy that compelled the sale of the Property and remand for a limited proceeding. 147 Broad has a right to be heard on the remedy. In that regard, we note Warren did not expressly request the Property be sold. He did make a broad claim for equitable relief and, therefore, we do not find that the court acted improperly in considering the sale of the Property. Instead, we remand for the limited purpose of allowing 147 Broad and Melissa to be heard. Melissa should be invited to intervene in the action and if she fails to or elects not to intervene then she will be bound by any determination made on remand.

IV.

We next address the appropriate and available remedies for Scott's conversion, unjust enrichment, and the violation of the joint venture. Those remedies can include a money judgment or the compelled sale of the Property. So, on remand, with all parties present and after making appropriate findings,

the court can enter either a money judgment, a judgment compelling the sale of the Property, or a judgment providing other appropriate relief.

"The general rule with regard to the measure of damages in conversion is to award the fair and reasonable market value of the property at the time of conversion." Chem. Bank v. Miller Yacht Sales, 173 N.J. Super. 90, 102 (App. Div. 1980). In other words, "the measure of damages . . . for conversion . . . is the value of the property converted." Arnold v. Hamilton Inv. Co., 132 N.J.L.10, 12 (1944).

Recovery in unjust enrichment cases "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." EnviroFinance Grp., LLC v. Env't Barrier Co., LLC, 440 N.J. Super. 325, 349 (App. Div. 2015). Accordingly, a recovery can also include "the amount the defendant has benefitted" from plaintiff's investments. Wanaque Borough Sewerage Auth. v. Township of W. Milford, 114 N.J. 564, 576 (1996); see also Restatement (Third) of Restitution and Unjust Enrichment, § 51 (explaining "the unjust enrichment of a conscious wrongdoer, or a defaulting fiduciary . . . is the net profit attributable to the underlying wrong").

Therefore, damages for conversion and unjust enrichment can include a money judgment. See Miller Yacht Sales, 173 N.J. Super. at 102; County of Essex v. First Union Nat. Bank, 186 N.J. 46, 61 (2006).

The remedy for a violation of a joint venture can include compelling the sale of property. In that regard, when a court has found a joint venture exists, and one party has violated the venture, the court can compel the sale of property. See Mitchell v. Oksienik, 380 N.J. Super. 119, 130-31 (App. Div. 2005) (explaining that once a joint venture has been found, the court may, pursuant to its "general equity power" resolve all issues between parties, including property disputes so long as there was actual notice of the specific relief sought). "Among the remedies available on partition—where other modes of relief are not practicable—is for sale of the property and division of the net proceeds between the parties." Id. at 127-28.

Moreover, courts have the authority to order the sale of property as a matter of judicial economy to resolve all issues between the parties. See Olson v. Stevens, 322 N.J. Super. 119, 123 (App. Div. 1999) (explaining that although the trial court's partition order was "premature," generally a compelled sale of property "advance[s] the objective[s] of judicial economy" to resolve all disputes relating to property in a single action). See also N.J.S.A. 42:3-19

27

(explaining that upon dissolution of an association, such as a joint venture, the court may proceed in a "summary manner").

Additionally, courts have broad discretion to award equitable remedies for breaches of a joint venture.  See, e.g., Rutgers Cas. Ins. Co. v. LaCroix, 194 N.J. 515, 529 (2008) (alteration in original) (quoting Mitchell, 380 N.J. Super. at 130-31 (stating that "[i]n doing equity, [a] court has the power to adapt equitable remedies to the particular circumstances of each particular case"); Coney v. Coney, 207 N.J. Super. 63, 75-76 (Ch. Div. 1985) (explaining when there is no legal remedy at law, "the court will impose equitable remedies to avoid" an unjust result).  In considering whether the sale of property is appropriate, a court should make explicit findings on the record for why the sale is required to reach an equitable result.  Swartz v. Becker, 246 N.J. Super. 406, 412-413 (App. Div. 1991) (citing N.J.S.A. 2A:56-2) (explaining that prior to the court ordering a sale "a finding . . . [the] sale will [] promote the interests of the parties" is "usually required").

Furthermore, a court may appoint a receiver for the sale of the property in accordance with the Uniform Partnership Law, N.J.S.A. 42:3-19 to -22.  Under that statute "[a]ny creditor … of any limited partnership association . . . after such expiration or dissolution in an action may apply to the Superior Court for

the appointment of a receiver"). N.J.S.A. 42:3-19. See also N.J.S.A. 42:3-22 (explaining receivers "shall have power to sell . . . property [or] rights and interests of the association"); see generally Fliegel, 272 N.J. Super. at 524 (explaining that joint ventures are a type of partnership and subject to the Uniform Partnership Law) (citing N.J.S.A. 42:1-1 to -43). The receiver may also take actions reasonably necessary to facilitate the sale, including establishing the fair market value of the property. See N.J.S.A. 42:3-21 (listing receivers' general powers, including "all other acts which might be done by the association . . . and that may be necessary for the final settlement of the . . . association").

Alternatively, if the court finds the sale is inappropriate, the court may issue a money judgment, with liens on the Property that can be enforced through an independent action by Warren. See EnviroFinance Grp., 440 N.J. Super. at 350 (explaining "[a]n equitable lien may lie when unjust enrichment or an express agreement to grant a lien against a specific property is shown").

We reject 147 Broad's and Scott's arguments that compelling a sale of the Property would violate RULLCA. In support of its argument against the compelled sale, 147 Broad cites to N.J.S.A. 42:2C-43, which provides:

> On application by a judgment creditor of a member, a court may charge the transferable interest of the

member with payment of the unsatisfied amount of the judgment with interest. To the extent so charged, the judgment creditor has only the rights of an assignee of the limited liability company interest. An action by a court pursuant to this section does not deprive any member of the benefit of any exemption laws applicable to his transferable interest. A court order charging the transferable interest of a member pursuant to this section shall be the sole remedy of a judgment creditor, who shall have no right under [RULLCA] or any other State law to interfere with the management or force dissolution of a limited liability company or to seek an order of the court requiring a foreclosure sale of the transferable interest. Nothing in this section shall be construed to affect in any way the rights of a judgment creditor of a member under federal bankruptcy or reorganization laws.

[N.J.S.A. 42:2C-43.]

147 Broad argues that in ordering a sale of the Property, the trial court exceeded the relief authorized under N.J.S.A. 42:2C-43 for a judgment creditor. In that regard, 147 Broad argues forcing a sale of the Property would lead to the forced dissolution of 147 Broad under its Operating Agreement and, therefore, would contravene N.J.S.A. 42:2C-43, which states a judgement creditor may not "interfere with the management or force dissolution of a[n LLC]."

This argument fails for three reasons. First, N.J.S.A. 42:2C-43 only prohibits creditors from applying to the court to "interfere with the management or force dissolution" of an LLC. Warren did not make an application to dissolve

147 Broad. Instead, he sought to have his interest in 147 Broad recognized. So, he was not acting as a judgment creditor of Scott.

Second, it is 147 Broad's Operating Agreement, not Warren's application or a court order, that will cause dissolution of 147 Broad upon a forced sale. Indeed, the trial court never ordered 147 Broad be dissolved. The Operating Agreement provides dissolution upon "the sale of the Property and all or substantially all of the assets of the Company and the collection and distribution of the proceeds of such sale." 147 Broad's members were free to draft their operating agreement in a manner that did not force dissolution upon the sale of the Property. They chose not to do so. More to the point, Scott, who drafted the Operating Agreement, elected to have the LLC dissolved if the Property was sold.

Third, as already discussed, courts have broad discretion to grant equitable relief for joint venturers whose enterprise comes to an end. See Mitchell, 380 N.J. at 127-30. This includes partition or sale of property that was acquired as part of the joint enterprise. Ibid. Accordingly, N.J.S.A. 42:2C-43 does not prevent the trial court from exercising its equitable discretion in granting relief that compels the sale of the Property acquired as part of Warren and Scott's joint venture. See N.J. Realty Concepts, LLC v. Mavroudis, 435 N.J. Super. 118, 130

31

(App. Div. 2014) (quoting Cameron v. Ewing, 424 N.J. Super. 396, 406 (App. Div. 2012)) (explaining that "the general policy of the law [is] to lend the creditor all reasonable assistance for the enforcement of his [or her] claim, especially against a debtor who, though possessed of the means to pay, seeks to evade [the] obligations"); Leonard v. Leonard, 428 N.J. Super. 272, 275-76 (Ch. Div. 2012) (examining N.J.S.A. 42:2C-43 and holding that a court may order financial distributions from the sale of an LLC's property to a judgment creditor).

V.

In summary, we affirm the trial court's findings that Scott engaged in conversions, unjustly enriched himself, and violated a joint venture he had with Warren regarding the ownership and operation of the Property. We also affirm all the factual findings made by the trial court. We remand for a limited hearing on the appropriate remedy or remedies to be awarded to Warren.

On remand, the trial court can use its discretion on whether to hold a further evidentiary hearing. We clarify, however, that the remand is limited to considering the appropriate remedies for Warren's damages. Neither Scott nor 147 Broad can dispute the court's findings that Warren has been damaged by Scott's conversion and unjust enrichment. We also iterate the trial court

32

correctly found that there was a joint venture, Scott violated the venture, and Warren is therefore entitled to a forty-nine percent interest in the Property. Therefore, on remand those issues, as well as the factual findings that support them, cannot be challenged by Scott or 147 Broad.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division